**UNITED STATES of America, Plaintiff,**

v.

**Jeffrey R. MacDONALD, Defendant.**

**No. 75-26-CR-3.**

United States District Court,
E.D. North Carolina,
Fayetteville Division.

March 1, 1985.

---

288

Brian M. Murtagh, Sr. Trial Atty., U.S. Dept. of Justice, Sp. Pros. Section, Washington, D.C., for plaintiff.

Wade M. Smith, Raleigh, N.C., Brian O'Neill, Santa Monica, Cal., for defendant.

## MEMORANDUM OF DECISION

DUPREE, Senior District Judge.

Serving three consecutive life sentences imposed by the court following his conviction by a jury in 1979 of three counts of murder, the defendant, Jeffrey R. MacDonald, filed post-trial motions on April 5, 1984 seeking either to have his convictions set aside or a new trial on the charges. The motions, one for a new trial under Rule 33, F.R.Crim.P., and two for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, came on for an evidentiary hearing on September 19–20, 1984.[1] The government vigorously contested the motions, filing seven volumes of affidavits in response. Final arguments on the motions having been heard on January 14, 1985, the

---

1. A fourth motion was also filed pursuant to 28 U.S.C. § 455 seeking my recusal from further action in the case. The motion was denied following oral arguments on August 21, 1984 and the reasons for the denial were recorded in the court's order dated October 1, 1984. MacDonald later filed a motion for reconsideration which was denied in open court preceding final arguments on his remaining post-trial motions.

court now enters its findings of fact and conclusions of law.

The facts of the case have been previously reported, *see, e.g., United States v. MacDonald*, 456 U.S. 1, 3–6, 102 S.Ct. 1497, 1499–1501, 71 L.Ed.2d 696 (1982); *United States v. MacDonald*, 531 F.2d 196, 200–02 (4th Cir.1976), *rev'd*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978), but for purposes of this decision they must be retold. In the early morning of February 17, 1970, MacDonald's pregnant wife, Colette, and his two daughters, Kristen and Kimberly, two and five years old, were clubbed and stabbed to death in their apartment at Fort Bragg, North Carolina. When military police arrived at the crime scene following a telephone call from MacDonald, they found MacDonald, a physician and Captain in the Army Medical Corps, unconscious and lying partially across his wife's body in the master bedroom. The bodies of Kristen and Kimberly MacDonald were found in their bedrooms. Although MacDonald had sustained a number of stab wounds, one of which partially collapsed a lung, he was treated at the Womack Army Hospital Emergency Room and released after a brief hospitalization.

On the morning and afternoon of the murders and in subsequent interviews, MacDonald told investigators that the murders had been committed by four drug-crazed intruders. He said that upon retiring at approximately 2:00 a.m. to 2:30 a.m., he found that his youngest daughter, Kristen, had crawled into bed with his wife and had wet his side of the bed. He picked her up and returned her to her own room and then went into the living room to lay down on the sofa where he fell asleep. Sometime later, he was awakened by his wife and oldest daughter's screams and looked up to see a woman with blonde hair wearing a floppy hat, boots and a short skirt carrying a lighted candle and chanting "acid is groovy; kill the pigs." He said that three men, two white and one black, standing near the couch then attacked him, pulling or tearing his pajama top over his head which he then used to ward off their blows. The three attackers continued to club and stab him until he lost consciousness. When he awoke on the hall steps to the living room, MacDonald stated that he got up and went to the master bedroom where he found his wife dead. He said that he pulled a Geneva Forge knife out of her body and covered her with his pajama top and a bathmat. He then went to his children's rooms and unsuccessfully tried to revive them. After going to the bathroom to wash himself and calling the military police, he again lost consciousness.

The military police, the Army's Criminal Investigation Division (CID), the FBI and the Fayetteville, North Carolina Police Department initially accepted MacDonald's account of the murders and immediately began searching for four people fitting his descriptions. At the same time, they continued to examine the crime scene and began to discover evidence which cast doubt on MacDonald's story. Although MacDonald had said that his pajama top was torn during his struggle with the three assailants in the living room, no fibers from the pajama top were found in that room. Fibers were found, however, inside and outside the body outline of Colette MacDonald in the master bedroom and in the rooms of Kristen and Kimberly MacDonald. A piece of a plastic surgeon's glove, stained with Colette's MacDonald's blood, was found inside a sheet in a pile of bedding at the foot of the master bed. Moreover, although there were numerous unidentified fingerprints in the apartment, no direct evidence of the alleged intruders was found to support MacDonald's version as to what happened on the night of the murders. From this and similar evidence, investigators became convinced that MacDonald had killed his family and staged the crime scene to cover up the murders.

The Army eventually charged MacDonald with the murders and a formal pre-court martial investigation was conducted and hearings held pursuant to Article 32 of the Uniform Code of Military Justice. At the close of the Article 32 proceedings, the investigating officer recommended that all charges against MacDonald be dismissed

and that civilian authorities investigate Helena Stoeckley, a young woman resembling MacDonald's description of the female assailant, as a possible suspect.

MacDonald was subsequently discharged from the Army but investigation of the case continued into the early 1970's. Over six hundred witnesses were interviewed and a thirteen-volume report, twice supplemented, was prepared by the CID. Based upon this report and other evidence gathered by civilian and military authorities and testimony by witnesses, one of which was MacDonald, on January 24, 1975 the grand jury indicted MacDonald for the murder of his family. A series of pre-trial motions and interlocutory appeals delayed trial of the case until July of 1979.

During the seven-week trial of the case, the government presented extensive physical and circumstantial evidence supported by expert and lay testimony. Physical evidence ranging from the amounts of Mac-Donald's pajama top fibers found in various rooms in the MacDonald residence to the pattern of blood spatterings on the victims and in the rooms of the apartment was offered.[2] The government also pointed to the absence of evidence in the apartment linking Helena Stoeckley or anyone else to the crimes, apparent contradictions in MacDonald's numerous accounts of what transpired that morning, and the marital difficulties MacDonald and his wife were allegedly having prior to February 17, 1970.

MacDonald's defense consisted primarily of his own testimony, character witnesses, and impeachment of the integrity of the crime scene and evidence offered by the prosecution. Although Helena Stoeckley was located during the trial and offered as an exculpatory witness, she testified before the jury that she was not involved in the murders but that because of her drug-crazed condition and bizarre behavior following the murders, she at least had come to wonder whether she was in fact involved. The jury apparently believed that she was not, for after six hours of deliberation MacDonald was found guilty of two counts of second-degree murder and one count of first-degree murder. Mac-Donald's convictions were affirmed on appeal by the Fourth Circuit Court of Appeals and the Supreme Court denied his application for a writ of certiorari. *United States v. MacDonald,* 688 F.2d 224 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). After the Supreme Court denied certiorari, Mac-Donald retained private investigators to interview witnesses, primarily Helena Stoeckley, and review documents in an attempt to either have his convictions set aside or be granted a new trial. This effort culminated in the present motions.

The government seeks to have all of the motions dismissed at the outset claiming that MacDonald knew of the evidence underlying the motions either before or shortly after trial and that he should have raised the issues at trial or on appeal of his convictions. Since he did not, the government argues, he is now procedurally defaulted from pursuing the motions unless he is able to demonstrate cause and actual prejudice for failing to have raised the issues earlier.

It is well settled that "to obtain collateral relief based on trial errors [not objected to at trial nor argued on appeal], a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982); *see Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Francis v. Henderson,* 425 U.S. 536, 542, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976). The reason behind the "cause and actual prejudice" rule lies in the intent of Congress when it enacted 28 U.S.C. § 2255 to

---

**2.** As fate would have it, MacDonald, his wife and two daughters all had different blood types: Colette MacDonald—Type A, Jeffrey Mac-Donald—Type B, Kimberly MacDonald—Type AB and Kristen MacDonald—Type O. This allowed investigators to reconstruct the sequence of events occurring in the MacDonald apartment on the night of the murders.

simplify "the procedure for making a collateral attack on a final judgment entered in a federal criminal case, but ... not to ... modify the basic distinction between direct review and collateral review." *Fraday*, 456 U.S. at 165, 102 S.Ct. at 1593. Once a criminal defendant has been convicted and his chance to appeal has been waived or exhausted, "[the public is] entitled to presume he stands fairly and finally convicted...." *Id.*

All three of MacDonald's motions have at their foundation evidence which he alleges was not discovered until after trial. Part of the newly discovered evidence, he concedes, was known shortly after trial when his convictions were pending on appeal, but the evidence was so undeveloped that it would have been of little use to him had he requested that the appellate courts remand the case to this court for consideration of the new evidence. *See* Rule 33, F.R. Crim.P.; *United States v. Atkinson*, 512 F.2d 1235, 1239–40 (4th Cir.1975); *United States v. Guthrie*, 387 F.2d 569, 572 (4th Cir.1967), *cert. denied*, 392 U.S. 927, 88 S.Ct. 2284, 20 L.Ed.2d 1386 (1968). The government replies that MacDonald had sufficient knowledge of the grounds of the motion when the case was on appeal but chose not to seek a remand for tactical reasons—that by not presenting the evidence before his conviction became final, he assured himself of yet another chance at having the conviction set aside through habeas corpus and new trial motions.

The government's position is not without some merit but procedural default rules are ill-suited to cases as complex and protracted as the present one. The court also has substantial doubt as to whether the cause and actual prejudice test can ever be applied to a case having as its basis newly discovered evidence. Procedural default has traditionally only been applied where a criminal defendant has failed to comply with an established "contemporaneous objection" rule requiring objection during trial. *See Brien v. United States*, 695 F.2d 10, 13–14 (1st Cir.1982); *Norris v. United States*, 687 F.2d 899, 906–07 (7th Cir.1982) (Cudahy, J., concurring); *United States v.*

*Corsentino*, 685 F.2d 48, 50–51 (2d Cir. 1982); *Pacelli v. United States*, 588 F.2d 360, 363 n. 8 (2d Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979). Of course there is no rule requiring contemporaneous objection to evidence the existence of which is not known at trial. Furthermore, the justification for the cause and actual prejudice rule, to preserve the integrity of the initial trial and appellate process, is served by the accepted rules in new trial cases requiring a criminal defendant to prove that the newly discovered evidence was discovered after trial, due diligence was used to discover it, and the new evidence would probably produce a different result on retrial. *United States v. Mesa*, 660 F.2d 1070, 1077 (5th Cir.1981).

In any event, if the motions are decided against MacDonald on the merits, it will make little difference whether he should have raised the issues at trial or when his convictions were on appeal. Thus, although the cause and actual prejudice test would indeed present a formidable barrier to MacDonald's motions, the court prefers in this instance to address the motions on their merits.

### I. *The Motion to Vacate Sentence*

In his first motion, MacDonald seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2255 on the ground that a government psychiatrist, Dr. James A. Brussel, now deceased, obtained information from him in violation of his Fifth and Sixth Amendment rights and that this information was used by the government as a basis for his cross-examination during trial. The government denies any impropriety or that any of the information provided by MacDonald to Dr. Brussel ever served as a basis for questions asked during cross-examination.

Dr. Brussel, a forensic psychiatrist, first became involved in the case when he was contacted by CID Agent Peter E. Kearns in February of 1971 during the reinvestigation of the case upon conclusion of the Article 32 proceedings. On February 7, 1971, Agent Kearns and CID Agent Wil-

liam F. Ivory met with Dr. Brussel at his home in New York City to discuss the case. After receiving a briefing on the crime scene and reviewing statements of Mac-Donald, autopsy reports and other background and investigative information, Dr. Brussel told the investigators that it was his opinion that MacDonald may have committed the murders. Motion to Vacate Sentence, Declaration of Karen R. Davidson at Ex. A. He suggested that MacDonald could have killed his wife in a fight, touched off by a disagreement over bedwetting, and then killed his two daughters because they were witnesses to the wife's murder. Dr. Brussel further stated that there were other inconsistencies between the crime scene and MacDonald's version of what happened. For example, if, as the physical evidence seemed to show, Kimberly MacDonald had been injured in the master bedroom and then carried back to her own bedroom, such behavior would be inconsistent with "hippie" involvement. Further, if there had been intruders in the apartment under the influence of LSD, Dr. Brussel believed that there would certainly have been evidence of their presence and MacDonald's claim that the female intruder had chanted "acid is groovy; kill the pigs" rang false.

Nothing more appears about Dr. Brussel in the record until the case came on for trial in July of 1979.[3] Prior to trial, the government filed a motion *in limine* seeking to limit the extent to which expert testimony from another psychiatrist, Dr. Robert L. Sadoff, could be used to support the credibility of MacDonald's account of the attack on his family. Dr. Sadoff proposed to testify that someone with Mac-Donald's personality configuration was incapable of committing such a murderous assault on his wife and children. The court initially deferred ruling on the issue, waiting until it arose in the context of the trial, and later ordered that MacDonald submit to an examination by psychiatrists chosen by the government before ruling on the

admissibility of Sadoff's testimony. See Trial Tr. at 4766–69, 4839–45. The government chose Dr. Brussel and Dr. Hirsch L. Silverman and it is their interview of Mac-Donald on the evening of August 13, 1979 which is the subject of the present motion.

The examination of MacDonald by Drs. Brussel and Silverman took place in the office of his defense counsel in Raleigh, North Carolina. Defense counsel were excluded from the interview which began with Dr. Silverman, a psychologist, administering various psychological tests to Mac-Donald over a two-hour period. At the conclusion of the testing, Dr. Brussel began a question-and-answer session which lasted approximately twenty minutes. According to MacDonald, the examination focused primarily upon the physical evidence in the case and his explanation of discrepancies between the evidence and his account of the murders. He alleges that Dr. Brussel asked him questions from a list which the psychiatrist told him had been provided by the prosecution and that he responded to the questions as follows:

Dr. Brussel: How do you explain the baby's (Kimberly's) blood spot(s) [on the pajama top]?

MacDonald: I have no idea and I doubt the Army was accurate anyway.

Dr. Brussel: Why wasn't the scene disturbed if you had a violent fight?

MacDonald: It was. And the fight didn't last too long—I was hit in the head.

Dr. Brussel: Who tore your pajamas?

MacDonald: It must have happened in the struggle. I never *heard* ripping. It could have been torn in the struggle or when I took it off my wrists—I have no idea.

Dr. Brussel: Why would you wrap the baby in your pajamas?

MacDonald: (No response. Asked him to rephrase the question.)

Dr. Brussel: Who wiped clean the weapon?

---

**3.** Dr. Brussel's conclusions and observations of February 7, 1971 were cited in two subsequent CID investigative reports but the court is unable

to determine the dates of these reports from Exhibits B and C to the Declaration of Karen R. Davidson.

MacDonald: I presume the assailants.

Dr. Brussel: Who wrote on the mirror?

MacDonald: If you mean the headboard, I presume one of the assailants did.

Dr. Brussel: Did you ever wear gloves that night?

MacDonald: Yes, I told the CID I probably wore gloves doing dishes.

Dr. Brussel: Did you have a blanket on the couch, and a pillow:

MacDonald: I believe I had a blanket (I may have said afghan) and the pillow would have been a throw pillow from the couch.

Dr. Brussel: What happened to the blanket and the pillow?

MacDonald: I have no idea.

Dr. Brussel: Why was there no evidence of intruders?

MacDonald: There was plenty, all ignored or screwed up by the CID.

Dr. Brussel: Like what?

MacDonald: Mud and debris seen by the MP's; hair in my wife's hand they ignored; the neighbors having been awakened by the dog; others who saw strange people; the lost fingerprints from the back door; writing on the headboard.

Dr. Brussel: Who, if not you, put those fibers all over the house?

MacDonald: Contamination from fibers on me, my arms could account for it or from the intruder's weapons or hands, or from the rescuers (MP's, etc.).

Dr. Brussel: Was your pajama top on when you saw your babies?

MacDonald: I was not wearing a top to the best of my recollection—I first went to Colette, but anything was possible.

Dr. Brussel: So you bled all over?

MacDonald: All I could remember was blood everywhere. My memory was of a very bloody scene and I had no idea I was bleeding until I saw it on my chest. When I looked in the bathroom mirror I saw it on my face and chest (I believe).

Dr. Brussel: Was your blood in the sink?

MacDonald: So the Army says. I have no way of knowing *whose* blood was on the sink and I'm not surprised mine was there. I *was* at the sink and everyone knows that.

Dr. Brussel: Who wiped the scene?

MacDonald: (I replied that I didn't know what he was talking about. If he meant the fingerprints, the critical ones were destroyed by the CID. If he meant the phones, the MP's said they used the phones and *their* fingerprints are not on them, so I presume *they* wiped them once they realized they shouldn't have used them.)

Dr. Brussel: How do you account for the lack of footprints under the windows?

MacDonald: There were no footprints found of MP's who went up to the windows. I have no answer to that.

Brussel: Why [did you], as a physician, put [your] daughter to bed with wet diapers on?

MacDonald: In most cases a single wet diaper or pair of underwear is not enough to harm anyone and I had in fact known that I was putting Kristen to bed with a wet pair of pants but did not change her for fear of waking her.

Dr. Brussel: [Were you] ever footprinted on February 17th?

MacDonald: No, I was not.

Dr. Brussel: How could [your] wife and children have been overkilled and [you] have suffered ... just one laceration "⅖ of an inch deep?"

MacDonald: This information is incorrect. I had multiple puncture wounds, stab wounds, several blows to the head and was found unconscious by the MP's.

Dr. Brussel: How could [you] possibly have seen four people in the house when [you were] knocked unconscious?

MacDonald: I saw these people before I was knocked unconscious.

Dr. Brussel: How many of [your] friends and neighbors saw these people enter the apartment?

MacDonald: Several.

Dr. Brussel: Why [were you] sleeping on the couch on the night of the crime?

MacDonald: Kristy had wet the bed.

Motion to Vacate Sentence, Declaration of Jeffrey R. MacDonald.[4]

Dr. Brussel was never called upon to testify at trial because the court eventually excluded the testimony of Dr. Sadoff and there was therefore no reason for the government to call Dr. Brussel or Dr. Silverman in rebuttal. *See United States v. MacDonald*, 485 F.Supp. 1087, 1094–97 (E.D.N.C.1979), *aff'd*, 688 F.2d at 227–28.[5] Despite this, MacDonald argues that the prosecution used Dr. Brussel as an agent to obtain a preview of his answers to questions about the physical evidence at the crime scene and that this information prompted the following questions, *inter alia*, on cross-examination:

> Prosecution: Suppose the jury should find ... that Type AB blood, the same as that of your daughter Kimberly, was found on the blue pajama top; and that you were not wearing that pajama top when you went to see Kimberly. Do you have any explanation for that?
>
> MacDonald: Pure conjecture. (Trial Tr. at 6862.)
>
> Prosecution: You did not hear any ripping [of the pajama top] at that time; is that correct?
>
> MacDonald: No. I do not recall hearing ripping sounds. (Trial Tr. at 6835.)
>
> Prosecution: Can you tell us how that [pajama] pocket (which was torn off the pajamas) got there [on the overturned portion of the throw rug]?
>
> MacDonald: It could have fallen from the pajama top when I took it off my wrists. It could have been moved when they moved myself or Colette ... I have no idea how it got there. I think there

are a lot of possibilities. (Trial Tr. at 6847–48.)

> Prosecution: Can you tell us how you fell off the sofa and the afghan that was on the sofa stayed on the sofa even though you went off of it?
>
> MacDonald: I am not aware that the afghan stayed on the sofa. (Trial Tr. at 6827.)
>
> Prosecution: Are you saying that you don't know whether it stayed on or off?
>
> MacDonald: That is correct. (Trial Tr. at 6827.)
>
> Prosecution: [S]uppose the Jury should find from the evidence that the blood in the bathroom sink is that of Type B, your blood; and assuming further or supposing further that the jury should find that it was not Type A, Type AB or Type O: do you have an explanation for that?
>
> MacDonald: No. (Trial Tr. at 6881.)
>
> Prosecution: [S]uppose the jury should find from the evidence that there is no blood or was no blood that was sufficient to be typed—sufficient quantities to be typed—on either the telephone in the master bedroom or the kitchen and that they should find from the evidence that you went there and used the phone as you have indicated: do you have any explanation for why there would be no blood?
>
> MacDonald: No. There was blood on my hands. I used the phone. I have no explanation for that lack of finding. (Trial Tr. at 6884.)
>
> Prosecution: [S]uppose the jury should find from the evidence that Type B blood, the same type as yours, is found in only one place on the blue pajama top

---

4. By agreement of the parties in open court on September 20, 1984, the final day of evidentiary hearings on MacDonald's motions, all "affidavits and declarations attached to or offered in connection with the motions and responses and replies thereto in [the] case, on each side, [were] entered ... in the record without objection from either side," for consideration by the court. Tr. Evid. Hearing, Vol. 2 at 101.

5. MacDonald makes a brief reference to Dr. Silverman also having been debriefed by the

government but apparently does not pursue this argument because there is no showing that any of the information obtained from Dr. Silverman's testing of MacDonald was used during cross-examination. For this reason, the court has limited its discussion to the events surrounding Dr. Brussel. It is enough to say that there is insufficient evidence from which the court could conclude that Dr. Silverman was either an agent of the prosecution or provided it with information detrimental to MacDonald.

belonging to you. Do you have any explanation for that, sir?

MacDonald: No. Just pure conjecture. (Trial Tr. at 6891.)

The core of MacDonald's motion to vacate sentence under 28 U.S.C. § 2255 is that the government retained Dr. Brussel who was, unknown to the defendants, an investigative agent directed to surreptitiously gather information from MacDonald for cross-examination. This, argues MacDonald, violated his right to effective assistance of counsel under the Sixth Amendment and his due process rights and privilege against self-incrimination under the Fifth Amendment to the Constitution. *See Estelle v. Smith*, 451 U.S. 454, 461–74, 101 S.Ct. 1866, 1872–79, 68 L.Ed.2d 359 (1981); *United States v. Wade*, 388 U.S. 218, 221–27, 87 S.Ct. 1926, 1929–32, 18 L.Ed.2d 1149 (1967); *Massiah v. United States*, 377 U.S. 201, 204–07, 84 S.Ct. 1199, 1201–04, 12 L.Ed.2d 246 (1964).

MacDonald principally relies upon two Supreme Court decisions, *Massiah v. United States* and *Estelle v. United States*, in support of his motion. In *Massiah*, federal law enforcement officers obtained incriminating statements from a criminal defendant, Massiah, who had retained a lawyer and was free on bail following his indictment by installing a radio transmitter in the car of a co-defendant who had decided to cooperate with the government. 377 U.S. at 202–203, 84 S.Ct. at 1200–1201. The statements were subsequently used against Massiah over his objection at trial and he was convicted of violating federal narcotics laws. *Id.* at 203, 84 S.Ct. at 1201.

Reversing Massiah's conviction, the Supreme Court held that he "was denied the basic protections of [the Sixth Amendment right to effective assistance of counsel] ... when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203. The Court's decision in *Massiah* thus prevents the prosecution from using an investigative agent

to secretly obtain incriminating statements from a criminal defendant in the absence of his attorney and from using these statements against the defendant at trial.

Following its decision in *Massiah*, the Court rendered its opinion in *Estelle v. Smith*, a case more factually similar to MacDonald's. The criminal defendant in *Estelle* was indicted for murder and the state decided to seek the death penalty in a bifurcated proceeding. The trial judge, *sua sponte*, ordered that Smith be examined by Dr. Grigson, a court-appointed psychiatrist, to determine whether he was competent to stand trial. 451 U.S. at 456–57, 101 S.Ct. at 1869–70. Dr. Grigson found Smith competent to stand trial and so informed the court. Smith was subsequently convicted of murder following the guilt phase of his trial.

During the penalty phase of Smith's trial, Dr. Grigson was called by the state to testify as to Smith's future dangerousness. Dr. Grigson had concluded from the competency examination, conducted without the permission of Smith's defense counsel, that Smith was a danger to society and had discussed his findings with the state's attorney and agreed to testify on behalf of the state. *Id.* at 459, 101 S.Ct. at 1871. He was the only witness for the state and testified that Smith was "a severe sociopath" who had no "regard for another human being's property or ... life...." *Id.* The jury imposed the death penalty and Smith appealed, arguing that the death penalty had been imposed upon him in violation of his Fifth and Fourteenth Amendment rights to due process and freedom from compelled self-incrimination and his Sixth Amendment right to the effective assistance of counsel *Id.* at 460, 101 S.Ct. at 1871.

Addressing Smith's Fifth Amendment argument first, the Court noted that although the trial judge had "ordered a psychiatric evaluation of respondent [to determine] his competency to stand trial ... the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent." *Id.* at

465, 101 S.Ct. at 1874. Under these circumstances, the Court found that "[w]hen Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase ... his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.* The Court went on to conclude that the failure of the state to inform Smith of his rights under *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966), deprived him of the procedural safeguards guaranteed to him by the Fifth Amendment. Based upon similar reasoning and relying upon its earlier decision in *Massiah v. United States,* the Supreme Court also held that Smith's Sixth Amendment right to the effective assistance of counsel was abridged because he was not given the opportunity to consult with his attorney about his participation in the psychiatric examination. *Estelle,* 451 U.S. at 469–73, 101 S.Ct. at 1876–78.

■ Arising from *Massiah* and *Estelle* is the general principle that the prosecution cannot use incriminating information gained from the examination of a defendant by a psychiatrist who is, in fact or in effect, an agent of the prosecution without first informing the defendant of, *inter alia,* his right to remain silent and to consult with his attorney. This principle is of little use to MacDonald here, however, because there is no evidence that the prosecution enlisted Dr. Brussel as an investigative agent, gave him questions to ask MacDonald, debriefed him following the examination, or used any information from the examination against MacDonald during trial.

There is evidence in the record that the defense knew of Dr. Brussel's participation in the case as early as April of 1971. Agent Peter E. Kearns met with chief defense counsel, Bernard Segal, on April 29,

1971 between 11:40 a.m. and 1:30 p.m. at the Americana Hotel in New York City. At that meeting, Kearns told Segal that he would furnish him with names of doctors who would review MacDonald's psychological tests on behalf of the government. Government's Response to Motion to Vacate Sentence, Appendix Vol. II, Ex. L at 1–2 and Attachment 1. Pursuant to their discussion, Kearns sent a letter to Segal on May 17, 1971 and included a Xerox copy of both Doctors Brussel and Silverman's resumes.[6]

From this, it seems beyond doubt that the defense, through Attorney Segal, knew that Dr. Brussel was somehow involved in the case. True, it is likely that defense counsel was unaware of the specifics of the February 6, 1971 interview between Brussel and Agents Kearns and Ivory, but it was certainly on notice that Dr. Brussel had been consulted before trial.

When the issue of psychiatric testimony came up at trial, the court ruled that before Dr. Sadoff could be called by the defense, the court would allow the prosecution to have MacDonald examined by one of its psychiatrists. Trial Tr. at 4768–69; 4839–45. The government, understandably, chose Dr. Brussel because he, like Dr. Sadoff, had been consulted earlier and was familiar with the case.[7] Although the defense was on notice that Dr. Brussel had participated in the early stages of the case, the record does not reflect any objection at trial or after trial on this ground. In fact, there would have been no ground for objection since Dr. Brussel had only a very limited role in the case prior to August 13, 1979. He had been consulted only once eight years earlier and had given only preliminary conclusions based upon documentary evidence. Ironically, his ultimate opinion was that "MacDonald is not telling the truth but this fact alone does not mean he is the murderer." Motion to Vacate Sen-

---

6. Although a copy of this letter does not appear in the record, it was apparently sent for it was later referred to in a CID investigator's statement dated March 31, 1972. Government's Response to Motion to Vacate Sentence, Appendix Vol. II, Ex. L at Attachment 4.

7. Dr. Sadoff had testified during the Article 32 hearings in 1970.

tence, Declaration of Karen R. Davidson, Ex. A at 2. This is hardly sufficient to show that the government had a duty to tell MacDonald or his lawyers of the details of the February 6, 1971 meeting, but even if it were, the evidence shows that the government never used Dr. Brussel as an investigative agent.

The only direct evidence supporting Mac-Donald's assertion that the prosecution enlisted Dr. Brussel as an investigative agent is contained in MacDonald's own affidavit. *See id.* at Declaration of Jeffrey R. Mac-Donald. Contradicting this affidavit are the affidavits of two attorneys for the prosecution, Brian M. Murtagh and James L. Blackburn, and the affidavit of Dr. Hirsch L. Silverman, the psychologist who examined MacDonald with Dr. Brussel. Government's Response to Motion to Vacate Sentence, Appendix Vol. II at Ex. F, H and K. Trial counsel for the prosecution unequivocally deny that any overtures were ever made to Dr. Brussel to bring him into their camp and Dr. Silverman states that neither he nor Dr. Brussel were furnished with a list of questions to ask MacDonald. Weighed against these affidavits, Mac-Donald's argument that Dr. Brussel was an investigative agent falls short of the mark. That the government's lawyers were not guilty of such misconduct is further reinforced by the court's recollection that in all stages of the case, counsel for both sides conducted themselves in utmost good faith.

Similarly without merit is MacDonald's supposition that Dr. Brussel was debriefed by government lawyers following the August 13, 1979 examination. There is no direct evidence of this but MacDonald contends that it must have happened because questions similar to those asked during the interview with Dr. Brussel were asked during his cross-examination and it would be illogical to conclude that the government did not debrief its own expert. Such theories are refuted by the affidavits of Murtagh and Silverman. As Murtagh candidly admits, corroborated by Dr. Silverman, he asked the two doctors while driving back from the examination "how the examination had gone, and what their opinion was about MacDonald's makeup, and credibility." Government's Response to Motion to Vacate Sentence, Appendix Vol. II, Ex. F at 7, H at 1–2. Although Dr. Brussel spontaneously stated that he had no doubt that MacDonald had committed the murders, was lying about it, and was a psychotic, no specific information on questions and answers was volunteered to Murtagh or elicited by him. Thus, the court finds that no debriefing took place.

In light of the foregoing, it is readily apparent that Dr. Brussel was never drafted into service by the prosecution to obtain information which was later used during MacDonald's cross-examination. This conclusion is amply supported by the affidavits of Murtagh, Blackburn and Laura Lipsitz, an attorney who helped prepare cross-examination notebooks during her tenure as a legal intern in the United States Attorney's Office in the summer of 1979. *See id.*, Ex. F at 1–3, K at 1–3, G. As these affidavits indicate, the eight years of investigative work which went into the case prior to its trial in 1979 yielded a more than ample independent basis for the questions asked during cross-examination. There was no reason for the government to rely upon Dr. Brussel as an investigative agent because the government already knew that Mac-Donald was unable to explain certain physical evidence at the crime scene. For example, CID Agent Shaw and MacDonald had the following exchange on April 6, 1970:

MacDonald: I'm sure I took this thing [the pajama top] off the first time. I don't—I didn't make a circuit with this jacket on, I don't think. I came down the hallway—I know that—and I went in, and I took it off to get my hands free—

Agent Shaw: Yeah.

MacDonald:—Basically—

Agent Shaw: Okay.

MacDonald:—And sometime while I was in there the first time, I—you know, I put it over my wife.

Government's Trial Exhibit 1135 at 74. Thus, the government knew that as early as April of 1970, MacDonald had been un-

able to explain how Kimberly MacDonald's blood had come to be on his pajama top for he had said that he took it off before going to her room. Similarly, the government was aware that MacDonald could not explain how his pajama top came to be ripped since during grand jury testimony on January 21, 1975 the following colloquy took place between him and Attorney Victor Woerheide who was handling the case for the government at that time:

> Woerheide: Now, somewhere in the fight the pajamas were ripped over the. I think you used the term ripped over your head. I was reading something this morning, I thought it was this particular one. But—how would you describe what happened so far as your pajamas tops were concerned during the course of the struggle?
>
> MacDonald: I don't know how they got around my hands sir, you keep telling me I said they were ripped. I never said that I know of.
>
> Worheide: Well, I saw it in something that I was just read—
>
> MacDonald: (Interposing) They were either pulled over my—over my head or was ripped from around my back. I don't know which. I have no idea.
>
> Woerheide: Well, during what phase of the struggle was this. Right at the very end, sort of before you went down and hit the floor?
>
> MacDonald: No, it seemed earlier than that because I remember my hands were bound up.
>
> Woerheide: Oh, did you hear a ripping sound or tearing sound at that time?
>
> MacDonald: No.
>
> Woerheide: Well, do you know in what manner they were torn or—
>
> MacDonald: I have no idea.
>
> Woerheide: All that you knew was they got around your hands and wrists and they hampered you in your struggle?
>
> MacDonald: That's right.

Government's Trial Exhibit 1141 at 4. The government also knew that MacDonald could not explain why fibers from his pajama top were found throughout the house. This knowledge was gained in early 1970 when CID Agents confronted MacDonald with this evidence in the following series of questions and answers:

AGENT SHAW:

Q: ... Now, again, your jacket.

A: Pajama top?

Q: Pajama top. Now, we've taken this thing and we've examined it under laboratory conditions. We know what it's made of. We know what kind of fiber is in it. We know what kind of threads are in it. We know how—that it's old.

A: Right.

Q: It's been around a long time. We know that it hasn't been repaired to the extent that there are foreign threads in it. That's—

A: Right.

Q: Okay, now, we have found fibers and threads in various places in the house. And one of the most puzzling things to me, personally, is that we found fibers from this jacket under Colette's body—strung out under her body—and I'm interested in how they came to be there.

A: Shaken off. I don't know. Mayb— do these things shed? Are they laying all around the house? I mean I don't know.

Q: No, it doesn't—

A: You mean they're big fibers?

Q: Yeah.

A: Not—

Q: Not microscopic.

AGENT IVORY:

Q: Not a fuzz.

A: Not a fuzz?

Q: No. It would be fibers and threads.

A: I don't know.

AGENT SHAW:

Q: Okay.

A. I can't answer that.

Government's Trial Exhibit 1135 at 67–69.

As these examples illustrate, the government was well aware of MacDonald's inability to explain certain physical evidence before August 13, 1979. It would be cast-

ing at shadows to conclude, as MacDonald does, that the basis of the government's cross-examination was information gained from Dr. Brussel when so much was known about the crimes before trial.

■ After studying the record and MacDonald's contentions in this motion, the court concludes that the motion is without merit and must be denied. Dr. Brussel was obviously chosen by the government as an expert because of his reputation as a criminologist and knowledge of the case, and not because of his willingness to serve as an investigative agent. There was, therefore, no violation of MacDonald's Sixth Amendment right to counsel or his privilege against self-incrimination and due process rights under the Fifth Amendment. Although Dr. Brussel may have personally believed that MacDonald murdered his family and even had been zealous in his questioning, the government in no way encouraged him or used him as an agent and its actions during this period of the trial are beyond reproach.

## II. *Motion to Set Aside Judgment of Conviction*

### The Basis of the Motion

Turning to the second motion brought under 28 U.S.C. § 2255, MacDonald claims that his conviction should be set aside because the government suppressed exculpatory evidence which, had it been introduced at trial, would have caused the jury to acquit him of the murders. The allegedly suppressed evidence includes (1) a half-filled bloody syringe; (2) bloody clothes and boots claimed to have belonged to either Helena Stoeckley or Cathy Perry Williams; (3) skin found under Colette MacDonald's fingernail; and (4) photographs of the letter "G" printed on the wall of Helena Stoeckley's apartment in Nashville, Tennessee. The government responds that it did not suppress any evidence, and that, regardless, the allegedly suppressed evidence is so immaterial that it could not have affected the outcome of the trial.[8]

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." From this brief passage, the court left no doubt that once a criminal defendant requests material, exculpatory evidence, the prosecution is under a duty to supply the evidence. Left open by the *Brady* decision was whether this duty existed when the defendant failed to request exculpatory evidence from the prosecution.

The question left open in *Brady* was answered by the Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which held that the *Brady* rule applied in three different situations distinguished by the specificity of the criminal defendant's request for the information and the materiality of the evidence requested. In the first situation, the *Brady* rule requires disclosure of evidence which "demonstrates that the prosecution's case include[d] perjured testimony and that the prosecution knew, or should have

---

8. In his motion and later filings in support of the motion, MacDonald also argued that the government suppressed (1) opinions of CID investigative agents that footprint evidence linking MacDonald to the crimes was unreliable; (2) information that Cathy Perry Williams had committed several stabbings in the Fayetteville area about the time of the MacDonald murders; (3) negatives of seven photographs of unidentified fingerprints taken from the MacDonald home; and lost (4) MacDonald's pajama bottoms. During final arguments on the post-trial motions, counsel for MacDonald in referring to the evidence underlying this motion stated that:

"Upon reflection, we think that we were wrong about two or three of them ... and this morning we will want to abandon our motion as to a couple of them. But on about four of them, we still believe with all out strength [they] ... would've made a real difference in the case." Transcript of Final Arguments at 19–20, January 14, 1985. The court concludes from this statement that MacDonald has abandoned his claims of suppression with respect to any evidence other than the bloody half-filled syringe, bloody clothes and boots, missing piece of skin, and photographs of the letter "G."

known, of the perjury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397; *see Mooney v. Holohan*, 294 U.S. 103, 110–13, 55 S.Ct. 340, 340–42, 79 L.Ed. 791 (1935). A conviction under such circumstances "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397; *see Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

The *Brady* rule also applies when the defense has made a specific request for evidence; that is, a request so clear that it gives "the prosecutor notice of exactly what the defense desire[s]." *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399. Failure by the government to supply the requested information in this second situation will result in a new trial if the suppressed evidence "might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398.

The *Agurs* court also found that the *Brady* rule imposes a duty upon the prosecutor to disclose material, exculpatory evidence even though the defense has made only a general request for exculpatory evidence or had made no request. The prosecutor commits constitutional error in such cases if he fails to disclose exculpatory evidence which would "create[ ] a reasonable doubt that did not otherwise exist...." *Id.* at 112, 96 S.Ct. at 2402.

In pleadings filed with the court and during oral argument, counsel for MacDonald has insisted that either the "any reasonable likelihood" or "might have affected the outcome of the trial" test should be applied to the facts of the case. Not surprisingly, the government takes the opposite view, arguing that assuming there has been a suppression of evidence, the court should apply the last *Brady* test and set aside the convictions and order a new trial only if suppressed evidence is found to "create a reasonable doubt which did not otherwise exist." Settlement of this disagreement only becomes necessary, of course, if it is first found that (1) the items were suppressed and (2) the evidence would have been favorable to the defense. *Moore*

*v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *United States v. Anderson*, 574 F.2d 1347, 1353 (5th Cir.1978). After reviewing the evidence and arguments on both sides, the court concludes that the government did not suppress evidence and, in any event, there has been an insufficient showing that the four items would have been favorable to the defense if introduced at trial.

### 1. The Half-Filled Bloody Syringe

MacDonald first contends that the government suppressed the existence of a half-filled bloody syringe which could have proved that he did not commit the murders. During the investigation of the crime scene at 544 Castle Drive, Fort Bragg, North Carolina, investigators found a variety of medical supplies in a hall linen closet. Among the supplies were seventy medications, at least fourteen disposable hypodermic syringes and eight boxes of hypodermic needles each containing twelve needles. Government's Response to Motion to Set Aside Conviction at Ex. B, Government's Trial Exhibits 1147–48. The closet also contained linen, and the sliding door to the closet was stained with the blood of Jeffrey MacDonald. Government's Trial Exhibit 344.

Hilyard O. Medlin was in charge of a group of technicians dispatched by the Army from its Fort Gordon, Georgia, Criminal Investigation Laboratory to assist CID investigators in processing the MacDonald crime scene. On February 21, 1970, the last day that investigators were at the MacDonald apartment, Medlin was debriefed by Special Agent Tool during the course of which he stated "that a half filled syringe that contained an as yet unknown fluid was located in a hall closet, which also contained some evidence of blood." Motion to Set Aside Judgment of Conviction, Declaration of Brian O'Neill at Ex. A. He also said that it "appeared that someone with a bloody hand had reached into this cabinet containing medical supplies for some purpose." *Id.* The record is thereafter devoid

of any further reference to this specific syringe.

MacDonald asserts that despite his request on several occasions for statements made by Medlin, the government failed to furnish him with the February 21, 1970 statement in which Medlin refers to the "half-filled bloody syringe." According to MacDonald, this non-disclosure by the government was a deliberate suppression of exculpatory evidence which violated his due process rights. The evidence is exculpatory, he argues, because the mere presence of a half-filled syringe with blood on it in the linen closet would substantiate his explanation that the murders had been committed by drug-seeking intruders. Furthermore, the blood on the syringe could have been typed and fingerprints processed, thereby possibly providing evidence which would have completely exonerated him of the crimes.

The government replies to MacDonald's assertions by providing a number of affidavits offered to show that no "half-filled bloody syringe" was found at the crime scene and that either MacDonald or his defense lawyers were aware of Medlin's statement to Special Agent Tool. The government goes on to argue that even if the syringe did exist and its existence was suppressed, it is pure speculation to suggest that the evidence was of itself exculpatory or could have yielded exculpatory evidence.

■ It is not necessary for the court to decide whether MacDonald or his attorneys knew of Medlin's statement prior to trial for there is insufficient evidence in the case from which the court could conclude that a "half-filled bloody syringe" ever existed. There is also insufficient evidence to support the conclusion that if such a syringe did exist, it would have provided exculpatory evidence to the benefit of MacDonald.

The only evidence that a "half-filled bloody syringe" ever existed is contained in Medlin's somewhat ambiguous statement to Agent Tool.[9] As Medlin's affidavit indicates, when he made his statement to Agent Tool he was only summarizing the information provided to him by other members of the crime scene processing team. Government's Response to Motion to Set Aside Conviction, Ex. B at 2. He had no first-hand knowledge of the contents of the closet and denies ever seeing a half-filled syringe which bore blood stains. The implication of his statement and its secondhand nature is that Medlin misunderstood what the other investigators told him about the contents of the closet. In fact this is what must have occurred, for investigative agents having firsthand knowledge of the contents of the hall closet state, or would state if called to testify at trial, that no "bloody half-filled syringe" or other half-filled syringe was found in the closet. *Id.*, Ex. D at 2; *see* Evidentiary Hearing Tr., Vol. 2 at 105. Moreover, the chemist who processed the hall closet for blood stains, Craig Chamberlain, and the agent who inventoried the medical supplies in the closet, Hagan Rossi, state without reservation that no half-filled syringe of any kind was found during the crime scene investigation. *See id.* at 105.[10] Measured against these statements by four witnesses having firsthand knowledge of the evidence gathered from the crime scene, MacDonald's argument, based as it is upon the statement of one witness summarizing information conveyed to him by others, that the government has suppressed evidence of a "half-

9. Medlin's statement that "a half-filled syringe that contained an as yet unknown fluid was located in a hall closet, which also contained some evidence of blood" is susceptible of two readings. Either the hall closet or the syringe, if it existed, could have been bloody. The court notes in passing that the former reading may be correct since there was physical evidence which showed that the sliding door to the hall closet was stained with Jeffrey MacDonald's blood.

10. The parties stipulated on the final day of the evidentiary hearing on the motions that if called to testify, Dr. Chamberlain, CID Agent Shaw and Hagan Rossi would testify that no half-filled syringes, with or without blood stains, were found during processing of the crime scene. Evidentiary Hearing Tr., Vol. 2 at 104–05.

filled bloody syringe" is simply not plausible.

Even if the syringe had existed, MacDonald's arguments would yet fail because he has not shown that the evidence would be favorable to him. *See Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *United States v. Barshov,* 733 F.2d 842, 848 (11th Cir.1984). The "mere possibility that [discovery of the syringe] might have helped [MacDonald], or might have affected the outcome of the trial, does not establish [materiality] in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976); *see United States v. Jackson,* 579 F.2d 553, 560 (10th Cir.1978); *Mixon v. Attorney General of State of South Carolina,* 538 F.Supp. 190, 193 (D.S.C.1982). As counsel for MacDonald conceded at oral argument, the evidence may have well been unfavorable to MacDonald at trial. MacDonald has therefore failed to offer enough evidence from which the court could find that the syringe, assuming its existence, or evidence derived therefrom, would have been of value to him either before or during his trial. Similarly, even if the government suppressed Medlin's statements to Agent Tool concerning the syringe, an assumption which the evidence also does not support, knowledge of Medlin's statements would have been to no avail to MacDonald since the underlying evidence did not exist. MacDonald's argument that he could have used Agent Medlin's statement to impeach the integrity of the crime scene and attack Medlin's credibility is also unconvincing in view of the fact that these tactics were used extensively at trial and to the extent that Medlin's statement tended to prove these issues it would only be cumulative. *See Agurs,* 427 U.S. at 109–10, 96 S.Ct. at 2400–01; *Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring in judgment).

### 2. The Bloody Clothes and Boots

MacDonald has consistently claimed that Helena Stoeckley, more about whom will be said later, participated in the murder of his family on February 17, 1970 and was wearing a floppy hat, short skirt and boots on that night. MacDonald now claims that in early 1971, the CID came into possession of bloody clothes and boots belonging either to Helena Stoeckley or to Cathy Perry Williams, a friend of Stoeckley. The boots were later returned by the CID to a friend of Williams and MacDonald now alleges that despite a June 13, 1979 pre-trial discovery request in which he sought "all information in the Government's possession which is of an exculpatory nature, including, but not limited to, recent reports by citizens of possible suspects, police and other investigatory files of possible suspects" and the CID's thirteen-volume investigation report on the crimes, the government never disclosed any information regarding the bloody clothes and boots to the defense team. The government concedes that the CID did have possession of the boots in 1971 but denies that there was any blood on the boots or that any clothes were ever turned over to the CID. The government also contends that MacDonald, through two of his former attorneys, knew that the CID once had possession of the boots and that the boots were properly returned to the woman who gave them to the CID because they did not match MacDonald's description of those worn by the female assailant and a laboratory analysis of the boots yielded no evidence connecting the boots to the crimes.

The history of how the "bloody clothes and boots" fell into the hands of the CID is as bizarre as other aspects of the case. Jackie Don Wolverton, a soldier stationed at Fort Bragg, North Carolina, awoke on the morning of December 29, 1970 to find that he was being stabbed by his roommate, Cathy Perry (now Cathy Perry Williams). Government's Response to Motion to Set Aside Conviction, Ex. J at 5–8 and Attachment 6. For obvious reasons, Wolverton threw Williams out of the apartment and gathered some of her belongings which he took to Mrs. Betty J. Garcia, another friend of Williams'. Mrs. Garcia accepted the items and Cathy Perry Wil-

liams moved in with her for a few days sometime shortly after the stabbing. After living with her a short time Mrs. Garcia concluded that Williams was suffering from severe mental problems created by drug addiction because she suffered from hallucinations and wore the same clothes every day for as long as she stayed with Mrs. Garcia. *See* Government's Response to Motion for New Trial, Appendix Vol. I, Ex. L at 5–7. This conclusion was reinforced by the fact that Williams had previously stabbed her own puppy to death while under the influence of drugs and had attempted to stab Mrs. Garcia's son shortly after the stabbing incident involving Wolverton.

After attempting unsuccessfully to help Williams, Mrs. Garcia contacted her uncle who picked her up and took her to a mental hospital in Raleigh, North Carolina. Mrs. Garcia then asked Jackie Don Wolverton to help her collect the remainder of Williams' belongings and Wolverton went around to various places Williams had stayed gathering things which he thought belonged to her but possibly could have belonged to other people. While going through the clothing, Mrs. Garcia found a pair of beige boots and some other items which led her to believe that Williams was involved in the MacDonald case.[11] *Id.* Through a newspaper reporter, Mrs. Garcia then contacted FBI Special Agent Lacy M. Walthall for assistance. Affidavit of Lacy M. Walthall, Jr., at 1, June 12, 1984.

Special Agent Walthall attempted to interview Mrs. Garcia on January 5, 1971, but she refused to open her door and told him that she had given all of Cathy Perry Williams' possessions to her lawyer, Charles Kirkman. *Id.* Kirkman in turn turned over the items to an associate, James R. Nance, who had represented MacDonald in a civil action before Chief Judge Algernon L. Butler of this court following the dismissal of charges against him by the military. Nance went to the office of Captain James Douthat, MacDonald's appoint-

ed military counsel at the Article 32 proceedings, the afternoon of January 6, 1971 and released Williams' belongings to CID agents William Ivory and Peter Kearns. In return Agent Ivory prepared a Military Police Receipt for Property listing the articles received from Nance, and signed by Ivory, Nance and Douthat. Included among the items turned over to the CID for evidence evaluation was a "Pair of Woman's boots, beige, w/tag THE GREAT BOOTS by GOLD SEAL." Government's Response to Motion to Set Aside Conviction, Exhibit N. There were no clothes listed on the receipt nor was there any indication that the boots or any of the items were blood-stained.

Routine laboratory analysis failed to provide any link between the boots and the MacDonald case and no blood or debris was found from which a comparison could be made to evidence gathered from the crime scene. Government's Response to Motion to Set Aside Conviction, Ex. J at 4–5 and Attachment 2. The boots also did not match the description that MacDonald had given to CID investigators on April 6, 1970 because he said that he "never saw white, muddy boots ... they were brown...." Government's Trial Exhibit 1135 at 6. Having failed to find any connection between the boots and the murders, the CID on February 2, 1971 returned the boots and other articles to Mrs. Garcia who signed the same receipt indicating that she had received the items. Copies of this receipt apparently languished in the files of both Douthat and the government, since the record does not show any further mention of the receipt or the "bloody clothes and boots" until the issue was presented in the present motion.

█ There is no evidence from which the court can find that any items other than those listed on the military property receipt were given to CID Agents Ivory and Kearns. The receipt is unquestionably authentic and was signed by representatives of both sides of the case, further evidenc-

---

**11.** No specifics appear in the record concerning what belongings of Williams led Mrs. Garcia to conclude that she had been involved in the murders.

ing its accuracy. Although the declarations of Douthat and James R. Nance both refer to clothes and boots, the property receipt does not list any clothes as having been received by the CID and both Agents Ivory and Kearns state that all items offered by Nance were taken for analysis but that no clothes were provided. Furthermore, there is no evidence in the record to support the argument that property other than that listed on the military property receipt was given to the CID investigators but not listed on the receipt. The court therefore finds that while a pair of beige boots was given to the CID by Nance, he did not deliver any articles of clothing to the agents.

The evidence is also conflicting as to whether there were any stains on the beige boots when they came into the hands of the CID. Nance recalls a brownish stain on one of the boots and Mrs. Garcia thinks that there "may have been some kind of a stain on the boots," but she is not sure. Government's Response to Motion for New Trial, Appendix Vol. I, Ex. L at 2, 8. This less than concrete evidence that the boots were blood-stained is contradicted by the affidavits of CID Agents Kearns and Ivory and Kerns' sworn statement of April 5, 1972 concerning the boots. Government's Response to Motion to Set Aside Conviction, Ex. D at 3, J at 4–5 and Attachment 2. Thus, while the recollections of two individuals of an event which occurred almost fifteen years ago suggest that the boots may have been blood-stained, the physical evidence in the form of the military property receipt, a sworn statement by one of the receiving agents made just over a year following the incident, and the present recollections of both of the receiving CID agents are to the contrary. Based upon this evidence, the court finds that the boots were not blood-stained. Furthermore, since the boots bore no stains, mud, or other debris connecting them to the MacDonald murders and they did not meet the description of the boots MacDonald said the female assailant was wearing on the night of the murders, the CID did not act improperly in returning the boots to Mrs. Garcia.

The court further finds that either MacDonald or his lawyers should have known about the existence of the boots and their receipt by the CID because both Douthat and Nance had represented MacDonald at some point in the case and Douthat had until recently a copy of the military property receipt in his files. MacDonald argues that knowledge on the part of Douthat and Nance should not be imputed to him, however, because Douthat's involvement in the case ended in December of 1970 and Nance's involvement was limited and ended prior to the close of the Article 32 proceedings in late 1970. In any event, so the argument goes, neither Nance nor Douthat were under any duty to pass the information to the defense and both deny having done so. The court has difficulty believing that these two lawyers, particularly Douthat, were so removed from the defense team in January of 1971 that they would have failed to bring the boots to the attention of MacDonald's lawyers, especially when it was well known that MacDonald had claimed a woman wearing boots had participated in the crimes. Even assuming they did not do so because they were unaware of the possible evidentiary value of the boots, this only underscores the fact that the prosecution was acting in good faith when it returned the boots to Mrs. Garcia simply because there was no reason to suspect that they were involved in the murders. The court is unwilling to go so far as to find that Nance and Douthat told MacDonald's lawyers about the boots in the face of the affidavits by these two members of the bar, but it does find that their apparent lack of concern in 1971 over the boots corroborates the conclusion that the CID did not suppress this evidence.

Finally, the argument that the beige boots could have been exculpatory cuts both ways for MacDonald. There is the possibility, though remote, that the CID could have made a mistake in its laboratory analysis of the boots or that the boots could have been used to MacDonald's benefit at trial either by impliedly connecting

Stoeckley or Williams to the crimes or by impeaching CID witnesses. It seems likely, however, that the government would have been able to deflect these arguments and use the boots as evidence against MacDonald. Assuming it could be shown that the boots belonged to Helena Stoeckley, the fact that they did not meet MacDonald's description and laboratory analysis failed in any way to connect them to the crimes would add weight to the government's position that Stoeckley did not participate in the murders and that MacDonald had actually murdered his family.[12] The exculpatory value of this evidence is thus equivocal at best and MacDonald has made an insufficient showing from which the court could find that the beige boots which were turned over to CID agents on January 6, 1971 would be favorable to him had he known of their existence.

Summarizing, a pair of beige boots was undoubtedly received by the CID on January 6, 1971. Similarly, it is clear that the CID did not take custody of any clothing and the boots were unstained by blood or any other substance connecting them to the MacDonald murders. Accordingly, the court finds that there was never any reason for CID agents to suspect that the boots were relevant to the case and they properly returned them to Mrs. Garcia after testing. Although MacDonald in his filings is unsure who owned the boots, Stoeckley or Cathy Perry Williams, it makes no difference for the court has been unable to find that the government suppressed the evidence.

### 3. The Skin Found Under Colette MacDonald's Fingernail

Fingernail scrapings were taken from Colette MacDonald by Dr. George E. Gammel during the course of autopsies of the MacDonald family at Womack Army Hospital on February 17, 1970. Government's Response to Motion to Set Aside Conviction at Ex. R. Dr. Gammel noted that "[a] small fragment of skin is found under the left little fingernail...." *Id.* The scrapings and five other items of evidence were given to CID Agent Bennie J. Hawkins who in turn surrendered the evidence to Craig S. Chamberlain on February 21, 1970 to take to the Army's crime laboratory at Fort Gordon, Georgia for analysis. *See id.;* Motion to Set Aside Judgment of Conviction, Declaration of Brian O'Neill at Exhibit C. In a statement given December 15, 1970, CID Agent William F. Ivory stated that he was at the Fort Gordon chemistry laboratory on the morning of February 28, 1970 and remembered that

> I had found a box that was marked as fingernail scrapings taken at Womack Army Hospital. I took some vials from this box and placed them under a microscope and adjusted the microscope so that I could see through the vials and observe the contents. One of the vials I picked up and viewed in that manner contained, what I thought to be, a small piece of skin. I drew this conclusion from seeing the oily texture of the substance. I brought this to the attention of Mr. BROWNING, from the laboratory, and he looked through the microscope and while he did not verbally state, "That is a piece of skin," his actions and utterances indicated to me that he agreed with what I had said. I subsequently learned that during laboratory examinations of the fingernail scrapings, they found no piece of skin.

Motion to Set Aside Judgment of Conviction, Declaration of Brian O'Neill at Exhibit D. Agent Ivory gave a similar statement on March 2, 1973 but he appears to have been more certain on this date that Browning agreed with him that the substance did

---

12. Stoeckley testified at trial that she owned a pair of white boots which came about halfway up her calves. Trial Tr. at 5589–90. These boots were apparently popular in the late 1960's and early 1970's. Stoeckley also testified that she, like many other women then and today, owned a pair of brown boots which went up to her knees. *Id.* This of course would corroborate MacDonald's statement that the female assailant on February 17, 1970 had been wearing brown boots which came just below the knee but these boots were never found or subjected to laboratory testing. *See* Government's Trial Exhibit 1135 at 6.

appear to be a piece of skin. *Id.* at Exhibit E.

Sometime between February 28, 1970 and December 19, 1970, as the government concedes, the piece of skin, if there was one, was lost. Government's Response to Motion to Set Aside Conviction, Exhibit S at 21. United States Attorney Thomas P. McNamara was aware of the lost skin at least as early as March 16, 1973, for on this day he requested that the CID attempt to find the piece of skin. *Id.* at Exhibit F. Despite "exhaustive attempts to determine the disposition of [the piece of skin]," the evidence was never found. *Id.*

MacDonald admits that either he or his attorneys were aware of the possibility that a piece of skin had been obtained from Colette MacDonald's fingernail because the defense had access to autopsy reports and heard Dr. Gammel testify concerning the autopsy findings at the Article 32 proceedings. Defendant's Reply to Government's Opposition to Motion to Set Aside Conviction at 11. He alleges that the defense did not know, however, the skin had been lost until after trial because the government had led the defense to believe that a re-examination of the scrapings had shown that they did not contain any skin. MacDonald also claims that the government withheld the statements of Agent Ivory which would have established that the skin had been lost and thereby lulled the defense into believing that the evidence never existed. Therefore, the defense had no way of knowing Ivory had knowledge of the skin and was unable to cross-examine him about its existence and loss during trial. *Id.* at 11–12.

The affidavits again do battle over whether the defense was aware that this piece of evidence had been lost by the CID. Clifford L. Somers, chief government counsel in the Article 32 investigation, recalls being chastised by Captain James A. Douthat, MacDonald's military appointed counsel, after he told Douthat that the evidence had been lost. He also stated that he is "sure [Bernard] Segal was aware of the conversation with Captain Douthat." Government's Response to Motion to Set Aside Conviction, Ex. I at 2, *see* Ex. D at 4–5. Douthat denies any such conversation took place and he and Bernard Segal strenuously assert that they were led to believe that the skin did not exist by a criminal investigation laboratory report No. P–D–FA–C–FP–82–70–R29, dated August 31, 1971, which stated that "[r]e-examination of Exhibits D–233 through D–239, D–256, E–4 and E–5 (the fingernail scrapings from the left and right hands of Colette, Kimberly, Kristen and Jeffrey MacDonald and debris from Colette MacDonald's right and left hands) did not reveal the presence of any skin particles." Government's Response to Motion to Set Aside Conviction at Exhibit U. MacDonald contends that this coupled with the government's failure to disclose Agent Ivory's statements concerning the skin misled the defense into believing that the skin had never existed.

Although not fully developed in his filings, MacDonald is essentially advancing two arguments with respect to this piece of evidence. First, he is claiming that his due process rights have been violated because the government lost valuable evidence. Second, he is alleging that the failure to disclose Agent Ivory's statements relating to the skin amounted to suppression.

"Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose content is unknown and, very often, disputed." *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984). In *Trombetta,* respondents were charged with driving while intoxicated and filed suit alleging their due process rights had been violated because California law enforcement officers failed to preserve breath samples which respondents argued they could have used to impeach intoxilyzer (breathalyzer) results. *Id.* at 481–83, 104 S.Ct. at 2530–31. Relying upon *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), the Supreme Court held that respondents' due process rights were not violated because "California authorities ... did not destroy respondents' breath

samples in a calculated effort to circumvent ... *Brady v. Maryland.*" *Id.* 467 U.S. at 488, 104 S.Ct. 2534. Rather, "the officers ... were acting 'in good faith and in accord with their normal practices.'" *Id.* at 488, 104 S.Ct. 2534 (*quoting Killian,* 368 U.S. at 242, 82 S.Ct. at 308). The court went on to note that respondents had failed to show that the breath samples possessed "exculpatory value that was apparent before the evidence was destroyed [and that the evidence was] ... of such a nature that the [respondents] would be unable to obtain comparable evidence by other reasonably available means." *Id.* 467 U.S. at 489, 104 S.Ct. at 2534; *see United States v. Webster,* 750 F.2d 307, 332–34 (5th Cir. 1984).

■ Although *Trombetta* involved intentionally destroyed evidence whereas MacDonald's claim is that evidence relative to his defense has been lost, the principles announced by the Supreme Court are useful in the present case. Like *Trombetta,* there has been no showing that the government acted in bad faith or radically departed from normal practices in handling this piece of evidence. The government was no doubt negligent in failing to preserve this unique piece of evidence which had a potentially significant impact on the case but it appears from the record that the loss of this evidence was completely accidental.

The court also concludes, consistent with *Trombetta,* "that the chances are extremely low that [the piece of skin] would have been exculpatory." *Id.* 467 U.S. at 489, 104 S.Ct. 2534. MacDonald contends that this evidence could have completely cleared him of the murders. This contention ignores the substantial direct evidence introduced by the government at trial, more fully addressed in the court's discussion of his motion for a new trial, and evidence tending to show that the piece of skin may very well have belonged to MacDonald.

At trial, military policeman Kenneth Mica testified that on the day of the murders MacDonald had scratch marks which looked as though "somebody had dug their fingernails into his chest." Trial Tr. at

1413. This observation and the significant amount of physical evidence which contradicted MacDonald's version of the murders diminishes the possibility that the skin found under Colette MacDonald's fingernail would have exonerated MacDonald. Because there is no evidence to support a finding that the government acted in bad faith in losing this potentially valuable evidence and its exculpatory value is open to serious doubt, the court concludes that the loss of the piece of skin did not violate MacDonald's due process rights under the Fifth Amendment to the Constitution.

■ MacDonald's arguments under *Brady* and *Agurs* are slightly more substantial but again the court finds that there has been no suppression of evidence. The CID laboratory report of August 31, 1971 is not a paragon of clarity but it was at least sufficient to put the defense on notice that the piece of skin referred to in Dr. Gammel's autopsy report and testimony at the Article 32 hearings no longer existed. Furthermore, although Agent Ivory's statements would possibly have highlighted the loss of the skin to the defense, the court finds that the statements would have been of little use to MacDonald in light of the questionable exculpatory value of the evidence and their use for impeachment purposes would merely have been cumulative. In short, while the court cannot condone the government's loss of this piece of evidence, neither can it conclude that there has been a suppression of evidence contrary to the requirements of *Brady* and *Agurs.*

### 4. The Photographs of the Letter "G"

Sometime after the MacDonald murders, Helena Stoeckley moved to Nashville, Tennessee where she began working as an informer for the Nashville Police Department. The police installed electronic surveillance equipment in her apartment at 1910 Portland Avenue and monitored the equipment from her former apartment at 1905 Portland Avenue.

CID Agent Richard J. Mahon was assigned responsibility in December of 1970 to investigate Stoeckley to determine whether she was involved in the MacDonald murders. Because Stoeckley had refused to be fingerprinted, Mahon traveled to Nashville on April 21, 1971 to attempt to gather finger and palm prints from the walls at 1905 Portland Avenue and CID photographer Frank M. Toledo went with him to take photographs of the walls. Toledo had previously worked on the MacDonald case and had seen the crime scene at 544 Castle Drive.

Toledo took forty photographs at 1905 Portland Avenue, making handwritten notes about each exposure as he went along. *See* Motion to Set Aside Judgment of Conviction, Declaration of Brian O'Neill at Exhibit G. Stoeckley had apparently put palm and fingerprints on the walls in paint and had also written on them in paint. Toledo took pictures of both the prints and the writing. As he was photographing the words written on the walls, Toledo had a "flashback" to the MacDonald crime scene and thought that the letter "G" in words such as "Good" and "Gemini" on the walls resembled the letter "G" in the word "PIG" which was written in blood on the headboard in the master bedroom of the MacDonald apartment. Government's Response to Motion to Set Aside Conviction, Ex. H at 2. He wrote this observation next to exposure No. 3 in his handwritten notes and referred to it again following his No. 5 exposure.

Toledo's observation never made it into his final typed report. In this report, he noted only that he had taken a picture of the "[l]etter "G" as part of some printings on the walls of" Stoeckley's apartment. Motion to Set Aside Conviction, Declaration of Brian O'Neill at Exhibit H. The similarity noted by Toledo was also not mentioned in Agent Mahon's report. *Id.* at Exhibit I. MacDonald now argues that the government suppressed evidence because it never gave him copies of Toledo's photographs or his notes. Without this information, MacDonald says that he was unable to corroborate his version of the murders by argu-

ing to the jury that the "G" on the wall of Stoeckley's apartment in Nashville was similar to the "G" appearing in blood on the headboard at the crime scene. Further, he claims that without having access to the photographs, he was deprived of the opportunity to have a handwriting expert compare the "G's" to determine who wrote them.

Although MacDonald may be correct that the government failed to provide him with Toledo's handwritten notes prior to trial, it appears that he did have access to the photographs. The government contends, and MacDonald does not seriously dispute, that the photographs were with a set of fingerprint photographs made available to the defense before trial. MacDonald counters, however, that when he gained access to the photographs there was insufficient time to review them prior to trial and in any event the defense would not have been aware of their significance without Agent Toledo's notes.

■ Regardless of whether the defense knew or should have known about the photographs, MacDonald has failed to demonstrate that this evidence would have been favorable to him. In a recent affidavit, Toledo states that not only did the "G's" on the walls resemble the "G" on the headboard at the MacDonald apartment, they also looked like "G's" which Toledo had seen in MacDonald's military course notebooks. Government's Response to Motion to Set Aside Conviction, Ex. H at 2. Moreover, recent analysis by the FBI at the request of the government showed that neither the "G's" on the walls in Nashville nor the "G" on the headboard at the crime scene "contain[ ] the inherent individual characteristics essential to ... meaningful comparison." *Id.*, Ex. W at 2. In other words, the letters do not have sufficient distinguishing characteristics to enable the FBI or anyone else to determine whether they were made by the same hand. It follows therefore that MacDonald has failed to introduce any facts from which

the court could find that this evidence was exculpatory.

As with all items of evidence which are the subject of this motion, MacDonald asserts that the CID purposely failed to disclose documents and that if he had known of these documents at trial he could have impeached government witnesses or the integrity of the crime scene. This of course is precisely what was done at trial and the court again finds that any such evidence would only have been cumulative. *See United States v. Agurs,* 427 U.S. at 109 n. 16, 96 S.Ct. at 2400 n. 16.

*Conclusion*

As the Supreme Court said in *Brady v. Maryland,* "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87, 83 S.Ct. at 1197. The court has cautiously reviewed the hundreds of pages supporting the contentions of the parties to determine whether there has been any suppression of evidence which could have been of exculpatory value to the defense. Over nine years passed between the murders and the trial of the case and, as is typical of cases of this magnitude, it generated an incredible amount of evidence and documents.[13] The court has not found, however, that the government suppressed any evidence or acted in bad faith in responding to the defense's requests for exculpatory material. Because there has been no suppression of evidence and the items which MacDonald claims were suppressed would, in all probability, have been of no exculpatory value to him, the motion to vacate sentence must be denied.

Even if the court found that the government had suppressed exculpatory evidence, it would not necessarily follow that Mac-

Donald's conviction must be set aside. As *Brady v. Maryland* and *United States v. Agurs* make clear, once the court has found that the government has suppressed exculpatory evidence, whether a conviction will be set aside depends upon the effect the evidence would have had on the trial. As noted earlier, if perjured testimony is knowingly used by the prosecution, a criminal defendant's conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. If, on the other hand, the exculpatory evidence was suppressed following a specific request by the defense, relief will be awarded if the evidence might have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2397. Finally, if the defense failed to request the suppressed evidence or made only a general request, a conviction will be set aside if the evidence would create a reasonable doubt which did not otherwise exist. *Id.* at 112, 96 S.Ct. at 2401. As we shall soon see, the evidence MacDonald claims to have been suppressed would not have affected the outcome of his trial under any of the three *Agurs* tests.

### III. *The New Trial Motion*

Claiming that he has newly discovered evidence which would convince a jury that intruders murdered his wife and daughters, MacDonald seeks a new trial on the murder charges pursuant to Rule 33 of the Federal Rules of Criminal Procedure.[14] In support of his motion, MacDonald has filed almost 1,000 pages of transcripts of "confessions" allegedly made by Helena Stoeckley to private investigators and statements by Greg Mitchell and Cathy Perry Williams which he offers to show their participation in the crimes. The motion is further supported

---

**13.** The parties have argued back and forth over whether many of the affidavits pertaining to this motion would be inadmissible hearsay at a new trial if one were held. Since the overwhelming majority of the affidavits are from or refer to witnesses who would have no reason to refuse to testify at a second trial, the court has assumed the evidence to be admissible.

**14.** This rule provides, in pertinent part, that "[t]he court on motion of a defendant may grant a new trial to him if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment...." Rule 33, F.R.Crim.P.

by dozens of affidavits of witnesses who MacDonald says corroborate the involvement of Stoeckley, Mitchell and Perry. The government has opposed the motion by submitting four volumes of affidavits of its own which contradict or impeach the evidence offered by MacDonald. The parties sharply disagree on the legal standard applicable to this motion and whether the evidence offered by MacDonald would be admissible even if a new trial were granted. Before answering these questions, a review of the government's evidence at trial and the substance of the newly discovered evidence is necessary.

### A. The Government's Evidence

Over the course of the seven-week trial of the case, the prosecution called twenty-eight expert and lay witnesses and introduced approximately 1,100 pieces of evidence in support of its case against MacDonald. The government's theory of the case was that MacDonald and his wife were having marital problems and began arguing on the night of the murders over their youngest daughter's bedwetting. Already fatigued from long hours of work, MacDonald flew into a rage and killed his wife and oldest daughter. MacDonald, according to the prosecution, then attempted to avoid prosecution and punishment by killing his youngest daughter and staging the crime scene to make it appear as if the murders had been committed by intruders. Ample circumstantial and direct evidence was introduced to support this theory at trial.

Colette and Jeffrey MacDonald were married while in college and by all accounts they were happy until at least late 1969 or early 1970. Colette's mother, Mildred Kassab, and the family's babysitter testified at trial that they noticed a change in the marital relationship sometime in early 1970. *See* Trial Tr. at 3263, 3558. On February 15, 1970, two days before the murders, Mildred Kassab spoke with her daughter on the telephone and Colette told her that she was not doing very well and was upset because her husband was going to be out of the country when their third child was born. *Id.* at 3268–69. She told her mother that she would "like to come home." *Id.* at 3269. Mrs. Kassab also testified that the MacDonalds, not unlike most young couples, often had financial problems. *See id.* at 3261–64.

Colette MacDonald had enrolled in a child psychology class at the North Carolina State University Extension at Fort Bragg, North Carolina, and attended class the night of February 16, 1970, less than twelve hours before the murders. One of her classmates, Elizabeth Ramage, testified at trial that Colette had started a class discussion that night by asking her psychology professor what should be done with her youngest daughter who often climbed into bed with her parents. *Id.* at 2824–25. The classmate, a friend of Colette's, testified that this was the only occasion on which she recalled Colette speaking in class. *Id.* at 2824. Following class, Elizabeth Ramage rode home with Colette and was the last person outside the family to see her before she was murdered. There were, of course, no witnesses for the prosecution to call in support of its theory that Colette MacDonald went home and later began arguing with Jeffrey MacDonald over bedwetting, but there was evidence of urine on a bed sheet in the master bedroom. Government's Response to Motion to Set Aside Conviction, Exhibit U.

Although the evidence offered to show that Colette and Jeffrey MacDonald were having marital problems and had a disagreement over their children's bedwetting which escalated into the murders was circumstantial, the prosecution also introduced an almost overwhelming amount of physical and other circumstantial evidence in support of its theory of the case. Because of the length of the trial and the amount of evidence introduced, it is not practical for the court to chronicle the evidence in great detail, but the following is a summary of the more significant evidence.

### 1. The Murder Weapons

After MacDonald's telephone call to military police on the morning of February 17,

1970, CID Agent Robert Shaw was dispatched to investigate the crime scene. In the rear of the apartment, outside a utility room door, Agent Shaw found a Old Hickory brand steel paring knife, an icepick, and a blood-stained piece of wood approximately 1%p5/8 inches by 1½ inches. Trial Tr. at 2340–44. Shaw also found a Geneva Forge Company paring knife with a bent blade in the master bedroom near a dresser. *Id.* at 2364.

The government was able to prove through laboratory analysis and expert testimony that the club, two knives, and icepick were the murder weapons. The club bore Colette and Kimberly MacDonald's blood and a splinter bearing Colette's blood type was found on a rug adjacent to where her head had rested in the master bedroom. Colette's blood was also found on the Geneva Forge knife. The autopsies of the MacDonald family also linked the four weapons to the crimes. Colette MacDonald's death had resulted from blunt trauma wounds which could have been caused by the club, sixteen stab wounds consistent with the Old Hickory paring knife, and twenty-one puncture wounds probably made by the icepick. Kimberly MacDonald died of blunt trauma wounds and stab wounds and Kristen MacDonald was killed by stab wounds and puncture wounds from an icepick.

MacDonald denied any knowledge of the murder weapons but the government offered evidence from which the jury could have found that the weapons came from the MacDonald home. For example, the wooden club was shown to have once been part of a larger piece of wood which was a bed slat in Kimberly MacDonald's bed because it perfectly matched the annual growth rings of the slat. *Id.* at 3812. Similarly, MacDonald claimed to have never had an icepick but there was testimony from two witnesses, Mildred Kassab and Pamela Kalin Cochran, that they had used an icepick in the MacDonald home to help them get frozen food out of the family's freezer. This evidence negated any contention that the weapons belonged to intruders and that they had brought them with them when they entered the apartment. Finally, although MacDonald told CID Agent Paul Connolly that one of the assailants in the living room had hit him with a piece of wood which he thought was a baseball bat, an extensive search of the living room yielded nothing to support his statement. *Id.* at 1727–28, 2684.

From the evidence connecting MacDonald to the murder weapons and his denial, in the face of contradicting testimony, that he had ever seen the weapons, the prosecution argued that he had used these weapons to murder his family. The lack of any physical evidence supporting MacDonald's claim that he had been attacked in his living room by drug-crazed intruders wielding these weapons directly supported this theory.

2. The Pajama Top and Pajama Top Demonstration

During an interview with CID investigators on April 6, 1970, MacDonald gave the following explanation as to why his pajama top was found on his wife's body:

Agent Shaw: Captain MacDonald, you told one of the other investigators earlier that you were wearing a pajama top that was pulled over your head, or something like that.

MacDonald: Right. Well, all I know is that—well, when I was struggling now—after I had been hit the first time, I was struggling with these guys; and my—somehow, my pajama top—I don't know if it was ripped forward or pulled over my head. I don't think it was pulled over my head. I don't remember actually—like backing my head through it.

But all of a sudden, it was all around my hands and it was in my way. And I remember that I was holding this thing in my hand—the guy's hand—that—that I couldn't maneuver very well. My hands were kind of wrapped up in the thing.

And as they were punching me, I was kind of using that a little bit, you know, holding it—right, exactly—'cause this guy, I thought, was really punching me

in the chest, you know, and in the stomach 'cause I—I was getting hit across here (pointing to the mid-section of his body).

So, in effect, I was blunting everything by, you know, holding this up; and I couldn't get my hands free out of this thing. And I remember I ended up, when I was laying on the floor—I forgot to say that—when I woke up on—it was still around my hands and everything, and I took it off as I was going in the bedroom. And after I took this knife out of my wife's chest, I—[put the pajama top on her chest,] you know, keeping her warm. You know, to treat shock, that would be (inaudible) and keep them warm.

Government's Trial Ex. 1135 at 12–13. This account of what happened on the morning of the murders was again contradicted by physical evidence introduced by the prosecution.

Paul Stombaugh, a former FBI special agent in charge of the Chemistry Branch of the Chemistry and Physics Section of the FBI's crime laboratory, testified that MacDonald's blue pajama top was made from a blend of polyester and cotton, was sewn at the seams with purple cotton thread and at the cuffs with blue-black cotton thread, and that the polyester yarns used in the garment were blue. Trial Tr. at 4090. Although MacDonald had said that he was not wearing the pajama top when he left the master bedroom, threads and yarns were found both inside and outside the apartment. A search of Kimberly MacDonald's bedroom yielded fourteen purple threads and five blue yarns and Kristen MacDonald's bedroom contained one purple thread and a blue yarn. Two purple threads were also on the blood-stained wooden club which was found outside the house near a utility room door. Contrary to MacDonald's statement that he had placed his pajama top on his wife's body upon entering the master bedroom, the tes-

timony showed that threads were found within the body outline of Colette MacDonald. In fact, sixty purple threads, eighteen blue polyester yarns, and one blue-black cotton thread were found in the master bedroom. No threads or yarns, however, were found in the living room where MacDonald said he had been attacked. *Id.* at 1727–28.

The prosecution also used the pajama top itself as evidence that MacDonald had murdered his family. Theorizing that the pajama top had become blood-stained during MacDonald's fatal attack on his wife and that MacDonald had put it on her and then repeatedly stabbed her with an icepick to create the illusion of a massacre, the government offered evidence which showed that the garment was stationary when the forty-eight puncture holes in it were made. *Id.* at 4074–75. The government also had laboratory experts fold the top in the same manner as it was found on Colette MacDonald's body to determine whether the pattern of forty-eight holes in the garment and in the body in any way coincided. The resulting demonstration showed that after the top was folded, a pattern of twenty-one punctures emerged, and these punctures, five on the right side and sixteen on the left, bore a striking resemblance to the pattern of icepick wounds suffered by Colette MacDonald.[15] Thus, MacDonald's own pajama top was perhaps the most incriminating evidence offered against him during trial.

### 3. The Pajama Top Pocket

According to MacDonald, after he awoke on the hall steps in the living room he went directly to the master bedroom where he found his wife's body. He then took his pajama top, from which he had been disengaging his hands as he was going down the hall, and placed it over her body.

While investigating the crime scene, CID Agents Ivory and Shaw found the pocket to MacDonald's pajama top on a throw rug at

---

**15.** MacDonald unsuccessfully challenged the admissibility of this demonstration on appeal. 688 F.2d 224, 228 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983).

the feet of Colette MacDonald. Expert testimony was offered at trial which proved that the pocket was stained with Colette MacDonald's type blood and that it had been stained prior to the pocket being torn from the pajama top. Trial Tr. at 3605–12. This evidence directly refuted MacDonald's statements about what he did after regaining consciousness and was offered by the prosecution to prove that the pajama top had been torn during a struggle with his wife. It also further supported the government's theory that MacDonald had put the garment on his wife and then stabbed her with an icepick to make his account of the murders more believable.

### 4. MacDonald's Eyeglasses

MacDonald told investigators that he had not been wearing his eyeglasses when he woke and began his futile effort to revive his family. This statement was claimed to be false because the eyeglasses, which were found in the living room face down, were found to have Kristen MacDonald's blood on them. The government argued that this inconsistency proved that the glasses had been stained during MacDonald's attack on his family.

### 5. The Bloody Footprint

A footprint stained with Colette MacDonald's blood was found leaving Kristen MacDonald's bedroom but no footprint was found entering the room. Laboratory analysis showed the footprint to be MacDonald's and he conceded that it was his and was probably stained in his wife's blood since he was in the master bedroom before going to Kristen's room. At trial, the government pointed to the inconsistency in MacDonald's story because no footprints were found entering Kristen's room. The prosecution used this evidence to support its theory that Colette had actually been assaulted in Kristen's room and then carried back into the master bedroom.

### 6. The Pieces of Latex Gloves

Pieces of a latex glove were found by CID investigators in the master bedroom between the body of Colette MacDonald and the master bed's headboard and inside the master bed sheet in a pile of bedding at the foot of the bed. Trial Tr. at 1729–31. Both pieces of latex were stained by blood of Colette's type and expert testimony showed that they were similar to latex surgeon gloves which were found under the kitchen sink in the MacDonald apartment. MacDonald's blood was also found near the kitchen sink. The prosecution argued that this evidence showed that MacDonald had worn latex gloves while murdering his family to avoid fingerprints and had written the word "PIG" in his wife's blood on the master bed headboard while wearing the gloves since there were no ridge lines in the writing as there would have been had the writing been made by a bare finger.

### 7. The Blood Spatterings and the Government's Reconstruction of the Crime Scene

The government drew support for its theory that MacDonald and his wife had an argument on the night of the murders which eventually led to the death of his wife and two daughters from the extensive blood spatterings throughout the apartment. Military police found Kimberly MacDonald's body in her bed when they arrived at the crime scene but they also found evidence of her blood on the master bedroom rug, the bathmat MacDonald said he had put on top of Colette MacDonald's body, a sheet from the master bed, and the wooden club which the government proved was used as one of the murder weapons. Trial Tr. 3639–46, 3661–77. There was also uncontradicted testimony that Kimberly's blood was found on MacDonald's pajama top even though he had testified that he was not wearing the pajama top when he went to Kimberly's bedroom.

The government used this evidence to argue to the jury that Kimberly had come into the master bedroom when MacDonald and his wife were arguing and had been struck during the argument. The government further argued that the presence of Kimberly's blood in the hallway of the

apartment showed that MacDonald had carried her back to her bedroom after she had been assaulted. Based on Kimberly's blood spatterings which were found on the wall of her bedroom and the fact that her body was found in that room, the government claimed that MacDonald had again assaulted her after returning her to her room to further support his story that the family had been attacked by four intruders while they were sleeping.

Blood spatterings in Colette MacDonald's blood type were found not only in the master bedroom but also in Kristen MacDonald's bedroom. Though Colette's blood was not found on the floor in Kristen's bedroom, it was found on the top and bottom sheet of Kristen's bed, *id.* at 3676–77, and on the master bed bedspread found wrapped in a sheet in the master bedroom next to Colette's body. The government contended that this evidence proved MacDonald had first attacked his wife in the master bedroom but that she had survived this attack and had gone to her youngest daughter's bedroom to either protect her or to continue the fight. The presence of Colette's blood on Kristen's bed and absence of it on the floor of the bedroom led the government to argue before the jury that MacDonald had again assaulted his wife in Kristen's bedroom but had placed her body on the master bed bedspread and sheet and carried it back into the master bedroom in an attempt to reinforce his story. The most striking evidence supporting this part of the government's theory of the case was MacDonald's footprint in Colette's blood which was found leaving Kristen's bedroom.

Kristen MacDonald's blood was found mixed with her mother's on Kristen's bed linen. Some of her blood was also found on the floor of her bedroom. The government's theory was that Kristen was not injured by her father in a fit of anger, but was intentionally stabbed to death by him to complete a staged crime scene which he hoped would lead investigators to believe that his family had been murdered in an attack by drug-crazed intruders. The jury apparently accepted the prosecution's theo-

ry, for MacDonald was found guilty of first-degree murder of Kristen MacDonald.

The government theorized from drops of MacDonald's blood found in the master bedroom sink beneath the mirror and the presence of scalpel blades in a nearby linen closet that MacDonald's wounds had been self-inflicted. MacDonald's wounds were for the most part superficial, and his treating physician termed his vital signs "very acceptable." *Id.* at 2855. Although he did sustain a fifteen to twenty percent pneumothorax (a partially collapsed lung), the prosecution hypothesized that he could have used the scalpel blades to inflict this wound and had in fact observed another physician treating a similar wound a short time before the murders. *Id.* at 2866–67. These facts led to the conclusion that MacDonald had wounded himself but not so severely as to put his life in jeopardy.

Finally, the government buttressed its theory with evidence which showed that MacDonald's latent fingerprints were found on an Esquire magazine which contained an article about the celebrated murders committed by Charles Manson and his cult. *Id.* at 3136–37. The magazine was found pinned under the edge of a coffee table in the living room of the apartment and it was also stained with a mixture of Colette and Kimberly MacDonald's blood. The prosecution argued from this evidence that MacDonald had probably read the article sometime before the murders and had perhaps referred to it on that night to help him stage the crime scene in such a manner that it would appear that a similar drug crazed cult had murdered his family.

8. The Absence of Physical Evidence Consistent With MacDonald's Account of the Murders

MacDonald's account of the murders found little, if any, support from the physical evidence gathered by investigators at the crime scene. There were no threads, yarns, splinters, or blood, except on the Esquire magazine, found in the living room, the area where MacDonald said he

struggled with the intruders. Although approximately seventy different medicines were found in the hall linen closet, the "intruders" did not take any of the drugs nor did they ransack the family's closets because the clothes in these closets were undisturbed. Similarly, although Mac-Donald had claimed that he was attacked by club-wielding assailants who stabbed at him while his pajama top was wrapped about his hands, he sustained only very limited injuries and, most importantly, no head wounds nor icepick wounds on his hands. Furthermore, despite MacDonald's contention over the years that four people which he later identified in some detail had been the assailants on the night of the murders, none of their fingerprints were ever found in the apartment.

The foregoing is but a brief summary of the more significant physical and circumstantial evidence, and the conclusions drawn therefrom, which the prosecution submitted against MacDonald at trial. There was also extensive expert testimony and a variety of other physical and circumstantial evidence pointing to MacDonald as the murderer. During the defense's presentation of its case, counsel for Mac-Donald repeatedly assailed as totally unprofessional the government's processing of the crime scene, the physical evidence, and the government's witnesses and theory of the case. The jury, however, apparently concluded that the prosecution's case was convincing, for it returned a guilty verdict after only six hours of deliberation.[16]

## B. The Stoeckley "Confessions"

At the foundation of MacDonald's motion for a new trial is his claim that after his trial in 1979, Helena Stoeckley gave a series of statements in which she voluntarily confessed in great detail to having participated in the murder of MacDonald's family. Since the night of the murders, MacDonald has maintained that his wife and two daughters were killed by two white males, a black male and a white female with blonde hair wearing a floppy hat, short skirt and boots. His accusations initially focused attention on Stoeckley, then a young woman about nineteen years old, because she resembled the description of the female intruder given by MacDonald. Stoeckley also lived near Fort Bragg and was associated with a group of drug-using military personnel, former military personnel and civilian men and women. An admitted heroin and opium addict in 1970, Stoeckley regularly used other drugs such as barbiturates, "angel dust," PCP (a horse tranquilizer), LSD (almost daily), THC (a marijuana derivative), hashish, marijuana and mescaline. From the day after the murders until her death on January 9, 1983, from bronchopneumonia complicated by cirrhosis of the liver, Stoeckley gave a seemingly unending series of statements concerning the murders, at times denying any knowledge of or participating in the crimes, and at other times fully confessing to having been a co-conspirator in their commission.

### 1. Stoeckley's Pre-trial Statements

On the day following the MacDonald murders, Fayetteville Detective Prince E. Beasley went to Helena Stoeckley's apartment to question her about the crimes. Beasley testified at trial that upon questioning her about her whereabouts on the night of the murders, Stoeckley told him "[i]n my mind, it seems that I saw this thing happen" but, she said, "I was heavy on mescaline." Trial Tr. at 5741–42. Beasley further testified that following the murders Stoeckley exhibited some rather bizarre behavior; she dressed in black as if in mourning and bought a number of funeral wreaths which she placed in her front yard and on her front door. *Id.* at 5742–43.

---

**16.** The court has undertaken to recapitulate the record evidence for the sole purpose of providing background against which the defendant's newly discovered evidence must be assessed. The court again expressly disclaims any opinion as to the weight of the evidence or the merits of the conflicting theories of the prosecution and defense. Its duty at trial was simply to rule on the sufficiency of the evidence to be submitted to the jury and to sustain the jury's verdict. These rulings were upheld on appeal.

Apparently because civilian and military investigators came to suspect from the physical evidence that MacDonald had murdered his family, they discontinued their investigation of Stoeckley for a short while. During the August, 1970, Article 32 hearings, however, attention again focused on Stoeckley as a suspect when several witnesses testified that she had told them she was unable to account for her actions on February 17, 1970 because she had taken so many drugs. The testimony of these witnesses and the recommendation of the hearing officer in charge of the Article 32 proceedings that Stoeckley be investigated prompted the CID to resume its search for evidence linking Stoeckley to the crimes.

Stoeckley moved to Nashville, Tennessee some time in late 1970 and there told two acquaintances of her possible involvement in the MacDonald case. In November, 1970, while she was ill with hepatitis and hysterical, she told her neighbor Jane Zillioux, that she could not return to Fayetteville because she was involved in murders there. She further told Zillioux that the victims were a woman and two small children and that she had disposed of the clothes she had been wearing to sever her connection with the crimes. *Id.* at 5691–700. Stoeckley also admitted to her friend that she "had been a heavy drug user and when you are on drugs, you do funny things" but said she couldn't tell Zillioux more because she could not remember. She told a similar story, although in more scanty detail, to another Nashville acquaintance, Charles Underhill, in December, 1970. *Id.* at 5711–13.

The CID began to reinvestigate Stoeckley in December of 1970 when it assigned Agent Richard J. Mahon to investigate the possibility that Stoeckley had been involved in the murders. Mahon interviewed her during one of her visits to Fayetteville on December 29–30, 1970. Stoeckley refused to take a polygraph or be fingerprinted but told Mahon that she could not recall what happened on February 17, 1970 after 1:30 a.m. because she had taken so many drugs. Government's Response to Motion for New Trial, Appendix Vol. IV at 1–2.

While living in Nashville, Stoeckley wrote a letter to Detective Beasley, in which she said "Beasley, what does the CID want of me? I didn't murder anyone?!!" *Id.* at Ex. 1. Beasley thereafter accompanied Agent Mahon to Nashville where he interviewed Stoeckley about the murders on February 27–28, 1971. Stoeckley again told him that she could not remember anything that happened on the night of the murders but said that she had been having dreams which she thought may have indicated she had some knowledge of what happened that night. *Id.* at Ex. 2. She further stated that she was afraid that she had a mental block about what happened that night and thought MacDonald may have murdered his family.

Mahon also spoke with Stoeckley's parents on April 7, 1971 concerning their daughter's behavior after the crimes. Her parents said that their daughter had laughed and joked about an August, 1970 newspaper article suggesting that she was connected to the crimes, but that as time went along and she thought more about it she began to have doubts about whether or not she might have been involved. They also noted that she needed constant praise and attention. From this interview with Stoeckley's parents, Mahon also learned that Stoeckley had been hospitalized at Womack Army Hospital on April 13–14, 1970. Reviewing the in-patient files at the hospital, Mahon found that Stoeckley had visited the hospital in an attempt to overcome her drug problems and psychiatric ward officials recommended that her parents take her to Chapel Hill for long-term psychotherapy. *Id.* at Ex. 3.

In late April of 1971, CID Agent Robert Brisentine, an Army homicide investigator, interviewed Stoeckley in Nashville. She had expressed a willingness to submit to a polygraph examination but on the first day of the interview Brisentine found her so impaired from drugs that he refused to administer the test. She was able to tell him that she did not think that she had participated in the murders but may have

been present when they were committed. She also indicated that she knew who had killed the family. The next day, however, she retracted her statements and said she had been lying about knowing who committed the murders. *Id.* at Ex. 4. Following this last interview, Stoeckley wrote a note to a friend of hers on the Nashville Police Department force in which she said: *"Please* believe I was *not* in that house!!! I really and truly don't know anything about the whole mess." *Id.* at Ex. 6.

Stoeckley's last statement of note about the crimes before trial came on April 26, 1971 when she was interviewed by Agent Mahon in Nashville. She once more denied any knowledge of the murders and repeatedly told Mahon that she was with Greg Mitchell until midnight on the night of the murders and had taken some mescaline which Mitchell gave her, got into a blue car by herself at her apartment around 1:00 a.m., and had driven to a bridge on the Cape Fear River where she stayed for several hours until she returned to her apartment. Later in the interview, she admitted that this story was a lie and that she had only told it because Beasley had told her to "tell them anything just to get them off your back." *Id.* at 20–22.

Several conclusions can be reached from Stoeckley's pre-trial statements. It is clear from these statements that the only truly consistent account that she gave of her actions on February 17, 1970 was that she had taken so many drugs that day that she could not remember what she had done during the night or early morning. Furthermore, despite her anxiety over her whereabouts, she does not appear to have been the least bit reluctant to talk about the incident. Finally, her child-like affection for Prince Beasley enabled him to act as a middleman between her and investigators, a role Beasley continued to play until Stoeckley's death in 1983.

### 2. Stoeckley's Trial Testimony

Stoeckley did not again figure prominently in the case until it came on for trial in July of 1979. She was located during trial and the court granted the defense a full day to interview her concerning her testimony. Testifying before the jury on August 17, 1979, Stoeckley openly admitted her drug addiction in 1970 and said that she had participated in witchcraft rituals with some of her friends which involved a lighted candle and the killing of small animals, usually a cat, and the sprinkling of the animal's blood over a person or thing. Trial Tr. at 5542–47. Consistent with her pre-trial statements, Stoeckley testified that on the day before the murders she had injected heroin six or seven times and the last thing she remembered was taking some mescaline given to her by Greg Mitchell around midnight, approximately three hours before the murders. She told the jury that she could not remember what she did between that time and around 4:30 a.m. the next morning when she returned to her apartment. *Id.* at 5553–57. Stoeckley also said that she had previously experienced similar drug-induced blackouts. *Id.* at 5662–63. Although she owned a floppy hat, blonde wig, and white boots in 1970, she stopped wearing the floppy hat and got rid of the wig and boots because people began to assume that she was a participant in the crimes and she became afraid since she did not have an alibi. *Id.* at 5602–04, 5652–53.[17] Although she was concerned about her lack of memory about what happened on the night of the murders and the circumstantial connection between her and the crimes, Stoeckley did not hestitate when asked whether she was involved and testified as follows:

Blackburn: To your own knowledge, did you participate in the killings of the MacDonald family?

Stoeckley: No, sir.

---

**17.** Stoeckley said that she threw her white boots in a trashcan because they might have connected her to the murders and because a heel came off one of the boots. Trial Tr. at 5603–04. This testimony contradicts MacDonald's claim in his motion to set aside convictions that the boots given by James Nance to CID agents belonged to Stoeckley and further undermines his argument that the government suppressed exculpatory evidence.

Blackburn: How do you feel towards children?

Stoeckley: I love children.

Blackburn: Of your own personal knowledge, did you kill Colette MacDonald?

Stoeckley: No, sir.

Blackburn: How about Kristen?

Stoeckley: No, sir.

Blackburn: How about Kimberly?

Stoeckley: No, sir.

Blackburn: Did you try to kill Dr. MacDonald?

Stoeckley: No, sir.

Blackburn: Do you know who did?

Stoeckley: No, sir.

Blackburn: Do you recall ever being in the MacDonald apartment carrying a candle?

Stoeckley: No, sir.

\* \* \* \* \* \*

Blackburn: Did you ever have occasion that you can specifically recall to go on Castle Drive by the MacDonald apartment?

Stoeckley: Not until after the murders.

Blackburn: Not until after the murders? Well, how long after—do you remember?

Stoeckley: About a year later.

Blackburn: About a year later? Why did you go back, if you recall?

Stoeckley: Just to see if anything would look familiar or jolt something in my memory or something.

Blackburn: To see if anything looked familiar? Did it?

Stoeckley: No, sir.

Blackburn: Did it jolt anything in your memory?

Stoeckley: No, sir.

*Id.* at 5648–50; *see id.* at 5579–83, 5613–32.

Read in its entirety, Stoeckley's trial testimony parallels her pre-trial statements. She told the jury, as she had told others before the trial, that she had taken so many drugs on the day before and night of the murders that her mind had become clouded and she could not recall what she had done between around 12 o'clock that night and 4:30 a.m. Regardless of how much the defense or prosecution prompted her, she could not recognize any of the victims or any part of the crime scene. After Stoeckley's testimony, the defense sought to introduce the testimony of seven witnesses to whom Stoeckley had allegedly made statements implicating her in the murders but the court excluded the statements because the defense failed to sufficiently show that they were trustworthy when made and the testimony would only have served to confuse the jury. Trial Tr. 5806–10; *see* Rules 403 and 804(b)(3), F.R. Evid.; *United States v. MacDonald*, 485 F.Supp. 1087, 1091–94 (E.D.N.C.1979), *aff'd*, 688 F.2d 224, 230–34 (4th Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). The jury apparently believed that Stoeckley played no part in the murders for it returned a guilty verdict against MacDonald.

### 3. The Post-Trial "Confessions"

Following MacDonald's conviction and while his case was on appeal, a group of his associates retained Private Investigator Ted L. Gunderson in late 1979 to further investigate the case and especially, it appears, to interview Helena Stoeckley about her possible involvement in the murders. Evidentiary Hearing Tr., Vol. 1 at 101–03. Gunderson, a retired FBI special agent and former agent in charge of the agency's Los Angeles, Dallas and Memphis offices, then enlisted the support of Prince Beasley in the investigation, since he considered Beasley essential to securing Stoeckley's cooperation. *See id.* at 117.

Gunderson and Beasley first interviewed Ernest Leroy Davis whom Stoeckley had met just before trial and married in April, 1980.[18] Defendant's Evidentiary Hearing Ex. 15 at 1–13. The couple lived in South Carolina until August of 1980 when they moved to Fayetteville and lived for a few days with a friend of Stoeckley's. *Id.* at 9–11. While staying with her friend,

---

**18.** The court will refer to Helena Stoeckley by her maiden name throughout the decision since she used a variety of aliases during her interviews with Gunderson and Beasley.

Stoeckley began fighting with Davis and on August 10, 1980, she took out an arrest warrant charging him with assault. *Id.* at 11.

Prince Beasley somehow learned about the outstanding warrant for Davis' arrest and, seizing upon the opportunity, located Davis in September, 1980, and told the Fayetteville Police Department where he could be found and arrested. Beasley then secured Davis' cooperation by agreeing to post bond for him in exchange for his agreement to accompany Beasley to California and tell all he knew about the MacDonald murders. Beasley and Davis then flew to Los Angeles, California, where Davis gave a lengthy statement to Gunderson and Beasley on September 30–October 1, 1980. At the conclusion of his statement, he told Gunderson and Beasley that he would do his best to get his wife to talk to them but cautioned them that if they ever told her he had given a statement she would not cooperate.[19] *Id.* at 181–84.

Although Davis still had an assault charge pending against him when he returned to North Carolina, he and Stoeckley left Fayetteville and went back to South Carolina. When Davis failed to appear in court on his assault charge, Beasley traveled to his home in South Carolina on October 21, 1980 where he arrested Davis. Evidentiary Hearing Tr., Vol. 2 at 42. Stoeckley was with Davis when Beasley arrested him and accepted Beasley's offer to ride back to Fayetteville with her husband. On the way to Fayetteville, Stoeckley and Davis began arguing and she learned during the course of their argument that Davis had gone to California and had given a statement to Gunderson and Beasley. Apparently unhappy at this secondhand account of her activities on the night of the murders, Stoeckley told Beasley that she was ready to tell him everything she knew about the MacDonald case. Evidentiary Hearing Tr., Vol. 2 at 49–51.

After Beasley and Stoeckley had dropped Davis off at the Fayetteville Police Department, they checked into the Bordeaux Motor Inn where at 11:45 p.m. that night Stoeckley gave to Beasley what was to be the first of a series of "confessions" to having been present during the MacDonald murders. Defendant's Evidentiary Hearing Exhibit 21. She and Beasley flew to California but upon being confronted with Gunderson as an interviewer, she told the investigators that she could not remember what happened that night. *Id.* at Exhibit 16. Stoeckley experienced a miraculous recovery of her memory the following day, however, and between October 24–25, 1980 gave fairly detailed confessions to the MacDonald murders.[20] *Id.* at Exhibit 2.

Stoeckley again "confessed" to Beasley and Gunderson in Los Angeles on December 4–5, 1980. Defendant's Evidentiary Hearing Exhibits 6, 8, 17 and 19. She later

---

**19.** Davis later told FBI agents that Gunderson and Beasley had told him that in return for his statement they would try to relocate him and Stoeckley and give them new identities. Government's Response to Motion for New Trial, Appendix Vol. II, Ex. O at 12. He also told the agents that Gunderson and Beasley had told him that the reason they were interviewing him was to gather information for a book and movie about the case. *Id.* at 13. The FBI agents showed Davis a copy of the statement he had made to Gunderson and Beasley and after having read it, Davis said that some of the information in the statement was true but that other information was either false or different from what he had told Gunderson and Beasley. *Id.* at 13–14. These revelations cast considerable doubt on the veracity of Davis' September 30 and October 1, 1980 statements.

**20.** Homer Young, a retired FBI special agent, was working with Gunderson and Beasley when Helena Stoeckley was interviewed in Los Angeles in October of 1980. In his affidavit of July 3, 1984, Young states that Gunderson and Beasley interviewed Stoeckley for hours upon hours, day after day, the entire time she was in Los Angeles, California, and that based upon his professional experience, "there was an element of duress present [during the interviews] and I further believe that Gunderson used unethical means and tactics on a very important case." Government's Response to Motion for New Trial, Appendix Vol. II, Ex. B at 4. Similar heavy-handed methods were used on Ernest Davis during his visit to California. *Id.* at 2–3. Assuming Young's allegations are correct, such tactics can only serve to call into question the voluntariness and truth of Stoeckley's confessions despite her statements to the contrary.

returned to North Carolina with Beasley and went with him to the crime scene at 544 Castle Drive to view the exterior of the MacDonald apartment and thereafter gave a statement in which she says viewing the scene helped her to remember that she entered by the kitchen door of the apartment on the night of the murders and left by the utility room door.

The flurry of confessions by Stoeckley continued in early 1981 when she gave statements to Fred Bost, a Fayetteville newspaper reporter, on January 2, 1981 and February 6, 1981. The statements covered essentially the same ground as earlier statements and were given pursuant to an agreement with Bost under which he was to write a book on the case and she would receive a portion of the proceeds. Evidentiary Hearing Tr., Vol. 1 at 45–49.

On July 30, 1981, Stoeckley wrote Gunderson a letter in which she said:

In all fairness to any person or persons involved in the investigation of the Jeffrey MacDonald murder case in 1970 at Fort Bragg, North Carolina, I feel that it is my moral obligation to inform you that my husband and I are in the process of immediate relocation. It is my opinion that in the preceding months I have been used as a pawn for your convenience and I also feel that in December of 1980 I was coerced into signing a so-called confession and that I was exploited by means of false hopes and empty promises.

Never have I seen a bigger mockery made of justice or such a shamble made of an investigation.

\* \* \* \* \* \*

When I finally agreed to cooperate with you, I thought I was doing what was morally right. I would also be freeing myself from a private hell, so I gave you as conclusive a review of the events of the night in question as I could. You, in turn, misconstrued and distorted all

statements made to you to be used against me at your convenience.

\* \* \* \* \* \*

Evidentiary Hearing Tr., Vol. 1 at 91, 122–24.[21]

Some three months later, on September 9, 1981, FBI agents went to Stoeckley's home in South Carolina and interviewed her in the presence of Ernest Davis. Stoeckley furnished investigators with a written statement disclaiming her October and December confessions to Gunderson and Beasley saying that

"[t]hese statements are basically accurate; however, the statements and the facts of the statements are what I think happened or dreamed and are not a positive recollection of events on February 16–17, 1970. The fact remains and the truth of the matter is that I do not actually know where I was during the early morning hours of February 17, 1970 and I do not know if I was present or participated in the MacDonald murders."

Government's Response to Motion for New Trial, Appendix Vol. I at Ex. D.

Obviously distressed at this turn of events, Gunderson and Beasley went to see Stoeckley at her home where they again interviewed her between May 20–24, 1982. Stoeckley, then pregnant, reinstated her confession but added that she was afraid to give names because she and her unborn child had been threatened by cult members. Significantly, Stoeckley also said that she had been in the MacDonald apartment three and one-half weeks before the murders for about fifteen minutes and had stolen a bracelet with a blue stone setting; three other cult members had been in the apartment on different occasions; and one cult member had talked to MacDonald in his apartment for about an hour and a half two weeks before the murders trying to get MacDonald to cooperate in treating drug addicts. *See* Evidentiary Hearing Tr., Vol. 1 at 183–84; Defendant's Evidentiary Hearing Ex. 18 at 183–85; 193–201. As far

21. This letter was read into the record at the evidentiary hearing but was never admitted as an exhibit even though it was marked by the

Clerk for identification purposes. *See* Evidentiary Hearing Tr., Vol. 1 at 91.

as the court can determine, MacDonald has never claimed that his apartment had been broken into immediately before the murders or that he talked with anyone in his home concerning drugs before the murders and there is no evidence in the record to suggest that these events took place.

Stoeckley's last statement on the Mac-Donald case came three days later on May 27, 1982 when she accompanied Gunderson and Beasley to New York City where she was interviewed for the television program "60 Minutes." She once more "confessed" to being at the MacDonald apartment on the night of the murders but refused to name who actually killed the family unless she was granted immunity from prosecution. Defendant's Evidentiary Hearing Ex. 13. Stoeckley apparently gave no other interviews or statements about the case between the May 27, 1982 taping and her death on January 9, 1983.

Viewed in the light most favorable to MacDonald, Stoeckley's statements provide the following explanation for the murders: [22]

Stoeckley was a member of a satanic cult which was angry with military physicians, MacDonald among them, because they refused to help drug users with their problems. The leaders of the cult decided to approach MacDonald in an attempt to obtain drugs from him and persuade him to treat drug addicts.

Stoeckley was assigned responsibility for determining the whereabouts of Colette MacDonald on the night of February 16, 1970 and made a pretext telephone call to the MacDonald residence at about 6:30 p.m. that evening and learned that Colette would be attending school at a North Carolina State University Extension at Fort Bragg that evening. She and several other members of the cult later went to the North Carolina State University Extension and spoke with her in an unsuccessful attempt to persuade

her to talk to her husband about the cult's concerns.

Later that evening, at approximately 10:30 p.m., Stoeckley, Greg Mitchell, Shelby Don Harris, Bruce Fowler, and Dwight Edwin Smith met at Stoeckley's apartment where they discussed their plans to go to MacDonald's apartment to seek his cooperation. Stoeckley thereafter took some mescaline offered to her by Greg Mitchell and the group went to two local restaurants where they stayed until the restaurants closed.

The Stoeckley group left a Dunkin Donuts restaurant at about 2:00 a.m. and drove to the MacDonald residence. Bruce Fowler then parked the car nearby and the group walked along the sidewalk to the rear of MacDonald's apartment and entered the home through a utility room door. It was dark inside the house and Stoeckley lit a candle to help the group find their way. They walked through the house and into the living room where they found MacDonald asleep on the living room couch with a book across his chest and a Valentine's Day card on the couch next to him. Stoeckley noticed that the television was on but there was no picture because there was no programming that late.

Some members of the group shook MacDonald to awaken him so that they could talk to him about drugs but upon awakening he became excited and began to fight with them. During the fight, Stoeckley chanted "acid is groovy; kill the pigs." When the group finally subdued MacDonald, they told him that they wanted drugs and he agreed to call a friend of his to see if he could get some. He went to a wall telephone in the kitchen but instead of calling his friend, he attempted to call the military police. The group overheard the conversation and again assaulted MacDonald, this time knocking him unconscious.

22. The statements contain numerous inconsistencies rendering it almost impossible to reconcile them into one cohesive statement of events. Giving MacDonald the benefit of all doubts, however, the court has chosen to recite in large part what MacDonald claims Stoeckley's statements prove occurred on the night of the murders and thereafter.

According to Stoeckley, things "got out of control" at this point and she heard Colette MacDonald calling to her husband for help from the master bedroom. Stoeckley went to the room where she saw Colette being assaulted by Greg Mitchell and another member of the group. She noted that one of the MacDonald children was in the master bedroom with her mother but appeared to be asleep. Stoeckley left the master bedroom and went into one of the children's bedrooms where she saw a record player, some books and a hobby horse which she noted was broken. She then heard the sound of running water in a bathroom and looked in to see Greg Mitchell washing his hands at the sink.

Stoeckley then heard a telephone ring and another member of the group told her to answer it. She answered the telephone and heard a soft voice ask for "Dr. MacDonald" whereupon she began to laugh until someone in the group ordered her to hang up the telephone. The group became scared and left in a hurry, leaving all of the murder weapons behind except for a pair of scissors.[23]

After leaving MacDonald's apartment, the group went to a Dunkin Donuts where Stoeckley went inside and washed her hands. She was eventually taken home at about 4:30 a.m. When asked by her roommate a few days after the murders why she had participated in the crimes, Stoeckley told her roommate that the MacDonalds deserved to die. She disposed of her floppy hat which she had been wearing during the murders and gave her blood-stained clothes and boots, which she had also worn, to a friend of hers, Cathy Perry. She told Perry to dispose of all of these items. The members of her cult eventually moved away from the Fayetteville, North Carolina area and lost contact with each other.

Called to testify at MacDonald's trial nine years later, Stoeckley perjured herself in order to escape prosecution. She eventually decided to confess to the crimes to clear her conscience.

This summary of Stoeckley's "confessions" does not fully reveal the contradictions and inaccuracies that predominate the statements. Not only does the size and composition of Stoeckley's group on the night of the murders vary from statement to statement, her certainty about whether the events took place at all changes depending upon whether she is talking to MacDonald's investigators or to the FBI. For instance, she states on several occasions that Allen Mazerolle was with the group on the night of the murders but prison records confirm that he was in jail from January 29, 1970 to March 10, 1970. *See* Defendant's Evidentiary Hearing Ex. 2, 3 and 8; Government's Response to Motion for New Trial, Appendix Vol. I, Ex. B at 13–16. Similarly, her claim that members of the group talked to MacDonald for almost eight minutes after having awakened him in an attempt to obtain drugs is inconsistent with MacDonald's version of events because he has never said that such a discussion took place. *See* Defendant's Evidentiary Hearing Ex. 2 and 3. As noted earlier, Stoeckley also recalls going into MacDonald's apartment herself before the murders and stealing a bracelet

---

23. In his affidavit attached to MacDonald's motion for new trial, Ernest Davis claims that Stoeckley told him that all the murder weapons had been left at the MacDonald apartment except a pair of scissors. Motion for New Trial, Declaration of Ernest Leroy Davis at 3. MacDonald argues that this statement proves the existence of a missing murder weapon and submits the February 15, 1984 declaration of Dr. Ronald K. Wright in support of this theory. *Id.* at Declaration of Ronald K. Wright, M.D. After reviewing the autopsy protocols and photographs of Colette, Kimberly and Kristen MacDonald, Dr. Wright was of the opinion that "at least 6 of the puncture wounds on Mrs. MacDonald's chest might have been inflicted by scissors" and "a number of the puncture wounds on the front of [Kristen's] body are consistent with scissors." *Id.* The court accords no weight to MacDonald's argument, however, because Dr. Wright subsequently explained on May 9, 1984 that "he [was] not saying [on February 15, 1984] that the wounds could not have been made by an icepick. In fact, the wounds on Kristen look more like icepick wounds ... than scissor wounds." Government's Response to Motion for New Trial, Ex. Q at 3–4.

with a blue stone setting and other members of the cult breaking into the apartment on other occasions but these events are totally unsubstantiated by any evidence offered by MacDonald. *See id,* Ex. 18 at 183–85, 193–201. Her attempt to explain away her statements about Mazerolle being involved in the murders by saying that she included him in her story as a means of discrediting her confessions to protect herself if she did not receive immunity, and MacDonald's explanation that his failure to remember the eight-minute discussion he had with members of the cult was caused by retrograde amnesia, are unconvincing. Motion for New Trial at Footnotes 2 and 3. More importantly, no physical evidence was uncovered at the crime scene which would support Stoeckley's confessions. To the contrary, the physical evidence, so the government contends, consistently pointed towards MacDonald as the murderer.

### 4. The Credibility of the Stoeckley "Confessions"

Aside from the inaccuracies and contradictions which become apparent upon reading Stoeckley's confessions together and against MacDonald's account of the murders and the physical evidence, the government has submitted the affidavits of witnesses who further discredit Stoeckley's story. A friend of Stoeckley's, Margaret Mauney, recalls lending her blue 1968 Chevrolet Corvair to Stoeckley on the evening of February 16, 1970. Government's Response to Motion for New Trial, Appendix Vol. I at Ex. A. According to one of Stoeckley's roommates, Diane Hedden Cazares, Stoeckley drove Cazares and Kathy Smith to the Village Shoppe in Fayetteville around 8:00 or 9:00 p.m. the same evening. *Id.,* Appendix Vol. IV at Ex. 10. After dropping Cazares and Smith off at the Village Shoppe, Stoeckley went to visit her parents who remember her coming home and complaining that she did not want to be around her apartment because her girlfriends were painting the bathroom at the apartment. *Id.,* Affidavit of Richard J. Mahon at 14. Mr. and Mrs. Stoeckley say Helena did not stay with them long that night, leaving by herself at around 10:00 or 10:30 p.m.

Diane Cazares remembers Stoeckley returning to the Village Shoppe with Greg Mitchell shortly before 11:00 p.m. *Id.,* Appendix Vol. IV at Ex. 10. Where Stoeckley went after she left the Village Shoppe and what she did between 11:00 p.m. when Diane Cazares last saw her and 4:00 a.m. the next morning when she returned to her apartment is not known, but the record does reflect affidavits concerning the whereabouts of the other people Stoeckley says went with her to the MacDonald apartment. Shelby Don Harris was with Diane Cazares at her apartment while she was painting the bathroom until about 5:00 a.m. the next morning and Bruce Fowler was with Kathy Smith at her trailer until late in the morning of February 17, 1970. *Id.* at Ex. 9, 10. Dwight Edwin Smith does not recall where he was on February 16–17, 1970 but denies any participation in or knowledge of the murders. *Id.,* Appendix Vol. I at Ex. X. Greg Mitchell also did not recall where he was on the night of the murders. He denies being with Stoeckley that night but cannot remember for certain whether he had gone out or was at home with his parents. *Id.* at Ex. W; Government's Response to Motion to Set Aside Conviction, Ex. D at Attachment 4.

The affidavits of these witnesses account for Helena Stoeckley's whereabouts on the night of the murders except for the period between 11:00 p.m. until 4:00 a.m. It seems likely that despite Mitchell's statement to the contrary, he and Stoeckley, who were dating in early 1970, went somewhere alone for the few hours between the time Diane Cazares last saw them and the time Stoeckley returned to her apartment early the next morning. Whether or not Stoeckley and Mitchell were together during this time, the affidavits of the witnesses who saw Stoeckley that night and were with members of the group whom Stoeckley claims committed the murders directly contradict the substance of her confessions, thereby diminishing their credibility.

■ It is within the province of the court when ruling on a motion for new trial based upon newly discovered evidence to examine the credibility of those individuals who give statements in support of the motion.[24] *See United States v. Johnson*, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946); *United States v. Jackson*, 579 F.2d 553, 558 (10th Cir.1978); *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir.1973); *United States v. Gantt*, 298 F.2d 21, 21–23 (4th Cir.1962). Helena Stoeckley testified before the court at trial and the court has reviewed her statements, the affidavits relating to her, and the videotape supplied by MacDonald of a television program featuring her, all of which lead the court to the conclusion that this woman is not reliable.

The court's conclusion that Stoeckley is not a reliable confessor should not be construed to mean necessarily that she was not telling what she believed to be the truth when she confessed to the MacDonald murders. From the very beginning, she said that she could not remember what she had done on that night because she had taken so many drugs. Based upon MacDonald's account of the murders, the Fayetteville police, military police and the FBI investigated members of the drug culture in Fayetteville and Stoeckley, quite understandably, became anxious because she could not recall where she was during the crimes. This anxiety, her drug-induced state of confusion, and the observations of her friends and Detective Beasley that she met the description of the woman involved in the murders led Stoeckley to believe that she might have participated in them but had a mental block about the night which prevented her from recalling details.

Stoeckley's uncertainty and the relentless attention the case focused upon her undoubtedly tortured her over the years. Her drug abuse of the late 1960's and early 1970's gave way to alcohol abuse in the late 1970's which contributed to her premature death in 1983. The confluence of her drug and alcohol abuse and uncertainty over her role in the crimes appears to have ultimately led her to believe that she was involved and to piece together her fragmented memory of 1970 into an explanation which MacDonald says amounts to a confession. Whether this was done innocently or by design to gain the attention which she craved is unclear from the record. What is clear is that considering all of the circumstances, neither Stoeckley nor her "confessions" are reliable. Thus, although the inconsistencies in Stoeckley's confessions and contradictions of the statements by the facts of the case and the affidavits of other witnesses would be more than enough to lead the court to conclude that the confessions are untrue, Stoeckley's unreliability adds even greater force to this conclusion.

5. Statements of Other Witnesses Corroborating Stoeckley's "Confessions"

Attached to MacDonald's motion for a new trial are the affidavits of some two dozen witnesses who appear to corroborate various aspects of Stoeckley's statements. At least four witnesses, Keith Bowen, Gary Mitchell, Deborah Lee Harmon, and Shelby Don Harris, recall that Stoeckley associated with Greg Mitchell, Dwight Edwin Smith, Harris and others while she was living in Fayetteville in 1970. Mabel Campbell and John Humphries claim that they saw Stoeckley and her associates gather on the evening of the murders and that the

24. The issue of Stoeckley's credibility was first raised by MacDonald in his motion for new trial when he introduced the affidavit of a psychologist, Dr. Rex Julian Beaber, to show that Stoeckley was a reliable affiant. *See* Motion for New Trial, Declaration of Rex Julian Beaber, Ph.D.; Addendum II to Reply to Government's Opposition to Motion for New Trial, Declaration of Rex Julian Beaber, Ph.D. Dr. Beaber is of the opinion that Stoeckley "was capable of ordinary perception, recollection and cognition and that

[she] understood the difference between truth and falsity." Addendum II to Reply to Government's Opposition to Motion for New Trial, Affidavit of Rex Julian Beaber, Ph.D. at 2. The opinion of Dr. Beaber, derived from his four-to-six hour examination of Stoeckley on December 7, 1980 is entitled to some weight but the court also recognizes that the government is precluded by Stoeckley's death from having her examined by a psychologist of its choosing.

group appeared high on drugs and acted rather strange. Still other witnesses, Frankie Bushey and Marian Campbell among them, place the group in the Fort Bragg area at about 1:30 a.m. on February 17, 1970. Joe Greene Sonderson, Addie Willis Johnstone, and Dorothy Averitt also support Stoeckley's statements by saying they saw members of the Stoeckley group together in the hours following the murders. MacDonald offers these affidavits to prove that Stoeckley's account of the events surrounding the murders is accurate.

If the statements of these witnesses are true, the net effect of them all would only be to place Stoeckley and her friends in Fayetteville at locations close to where she and other members of the group lived in 1970. The court does not doubt that members of the group frequently gathered at the named restaurants late at night. Nevertheless, this is only very weak circumstantial evidence proving that Stoeckley and her group were in the general Fort Bragg area at about the time of the murders.

Former Fayetteville detective Prince Beasley figures prominently in MacDonald's motion for a new trial because of his relationship to Helena Stoeckley. Stoeckley worked for Beasley as an informant in Fayetteville in 1970 and their friendship appears to have lasted until the time of Stoeckley's death. The court's impression from the record is that Stoeckley looked up to Beasley and Beasley gave her the attention which she seems to have at times sought. At all stages of the case, the defense has obtained information from Stoeckley by using Beasley as its contact with her.

Beasley has given a series of statements, trial testimony and affidavits over the years which substantiate Stoeckley's involvement in the crimes. These statements have rarely been accurate. Upon hearing Beasley's *voir dire* testimony at trial to the effect that he had stopped Stoeckley and several of her male companions for about an hour on the morning of the murders and

then let them go when CID agents did not arrive on the scene, this court noted that

> [i]f it is within the province of this court to pass on the trustworthiness of a witness who proposes to testify ... this court would be constrained to hold Officer Beasley's testimony to be unreliable. It is simply incredible that any self-respecting, competent police officer who really thought that he had a substantial lead toward solving these sensational murders would allow the suspects to go after waiting only an hour for the Army investigators....

*United States v. MacDonald,* 485 F.Supp. at 1092.

The court's evaluation of the trustworthiness of Beasley in 1979 is left unchanged by his most recent statements and the court's observation of the demeanor of this witness during the evidentiary hearing on the post-trial motions. While the court does not believe this seriously ill man to be lying, medical records introduced by the prosecution clearly show that he cannot consistently distinguish fact from fiction. *See* Government's Evidentiary Hearing Ex. 23–26. For this reason, the court attaches no significance to Beasley's statements and concludes that they are insufficient to corroborate Stoeckley's "confessions."

MacDonald next claims that the affidavit of Edith Boushey, a former English teacher and coordinator of the Modern Language program at the North Carolina University Extension program at Fort Bragg, North Carolina, corroborates Stoeckley's statement that she went to the Extension campus on the night of February 16, 1970 to talk to Colette MacDonald. Boushey recalls that at about 9:40 p.m. on that night, she was walking past a group of people in the stairwell of a building on campus and one member of the group, whom she identified as Greg Mitchell, was talking to Colette MacDonald. Motion for New Trial, Declaration of Edith Boushey. According to Boushey, as she walked by Colette, she heard Mitchell saying, "If you go along I think it will be all right." She then heard a part of Colette MacDonald's

response in which she said, "I dread...." *Id.* at 2. Mrs. Boushey says that the group in the stairwell included at least three other women, two of whom were wearing floppy hats.

Mrs. Boushey's account of the meeting between MacDonald's wife and members of the Stoeckley group is directly contradicted by the affidavit of Elizabeth Ramage, the friend of Colette MacDonald who accompanied her to class on the evening of February 16, 1970 and was with her until Colette dropped her off on the way home from class. Mrs. Ramage states that she was with Colette at all times during class and left with her between 9:20 and 9:30 p.m., some ten minutes before Mrs. Boushey said the meeting between Colette and Greg Mitchell took place. Government's Response to Motion for New Trial, Appendix Vol. II at Ex. D. She remembers nothing unusual happening that night, either during or after class.

Mrs. Boushey's statement only loosely parallels Stoeckley's version of the meetings and a review of the following portion of Stoeckley's May 24, 1982 statement to Gunderson reveals that Stoeckley herself was unclear about the details of the incident or whether it actually took place:

Gunderson: Go on back to Colette that night—the night of the murders. She attended an extension course at one of the schools in the Fayetteville area— maybe it was Fort Bragg, I am not sure. Did any of the members of your cult talk to her in the hallway that night at the school?
Stoeckley: One member ran into Colette, but it wasn't at school, it was before she got there.
Gunderson: Tell us about that.
Stoeckley: I don't know where or anything else, I just know they ran into her early that evening, before they said for me to call because they wanted to make sure she was going to take the course that evening.
Gunderson: Just before your call? Did this member talk to Colette?
Stoeckley: No.

Gunderson: Just saw her?
Stoeckley: They just saw her.
Gunderson: Was Sheila Hamby the person who, with some male hippies, met Colette in the hall at the school the night of the murders?
Stoeckley: Yes.
Gunderson: Why? What was discussed?
Stoeckley: I don't want to talk about it.
Gunderson: Who accompanied Sheila to the school?
Stoeckley: I don't want to talk about it.
Gunderson: Will you identify them?
Stoeckley: No.
Gunderson: How many were there?
Stoeckley: Two men.

Defendant's Evidentiary Hearing Ex. 12 at 25–26. Not only are Stoeckley's May 24, 1982 statements about the meeting sketchy, she said that the group which went to the University consisted of two males and a female but Mrs. Boushey remembers that there were at least three females and one male whom she saw in the hallway. This inconsistency makes it impossible to reconcile Boushey's statement with Stoeckley's.

In view of the affidavit of Elizabeth Ramage and the inconsistency between Stoeckley and Mrs. Boushey's accounts of the February 16, 1970 meeting, the court can only conclude that either Mrs. Boushey's memory of the events of that evening is faulty or she is mistaken about the two people in the hallway being Colette MacDonald and Greg Mitchell. The court finds, therefore, that Mrs. Boushey's affidavit is of no corroborative value.

Neither can the court find that the affidavit of Carlos Torres proves that the Stoeckley group was in the MacDonald apartment on the morning of February 17, 1970. Torres testified at the evidentiary hearing that he was stationed at Fort Bragg, North Carolina, in February of 1970 and was working part-time at the post NCO club. Evidentiary Hearing Tr. Vol. 1 at 65. Torres left the club about 2:00 a.m. and proceeded up Bragg Boulevard until he stopped at a stoplight near Castle Drive.

While stopped at the light, he noticed a blue 1962 or 1964 Volkswagen stationwagon parked on the side of the road. *Id.* at 66–69. He observed one person in the van, one outside the van, and two other people walking toward the van from a wooded area but was unable to identify any of the four people.

Torres' statement is inconsistent with Stoeckley's confessions in which she says the blue car the group was riding in on the night of the murders was a Ford Mustang, not a Volkswagen van. The two vehicles are in no respects similar. Furthermore, as he admitted on cross-examination, Torres had just returned from Viet Nam in early 1970, was in the process of a divorce, and, in his own words, "wasn't in a condition to reveal this and get any more nervous and attention." *Id.* at 73. Under these circumstances, the court finds that Torres' testimony is not credible as corroboration for Stoeckley.

■ The court has also reviewed the other affidavits which MacDonald filed in support of Stoeckley's confessions. These affidavits, like those previously discussed, suffer from either factual inaccuracies or contradictions which render them of no use to MacDonald in proving that Stoeckley and her group committed the murders.

## C. The Confessions of Greg Mitchell

Stoeckley implicated her good friend Greg Mitchell in her confessions by alleging that he was with her in the MacDonald apartment and was responsible, at least in part, for killing Colette MacDonald. *See* Evidentiary Hearing Ex. 2 and 3. MacDonald now claims to have newly discovered evidence which shows Mitchell confessed to the murders and expert testimony proving that Colette MacDonald was struck by a club wielded by a person who, like Mitchell, was left-handed.

Sometime in early March of 1971, a man fitting Mitchell's description appeared at "The Manor," a church-affiliated house pro-

viding counseling to young people with alcohol or drug problems. Later in the week during a prayer session, the man told Ann Sutton Cannaday that he was part of a cult in Fayetteville and that he had murdered people. Motion for New Trial, Declaration of Ann Sutton Cannaday. The man left the following day after having stolen clothes belonging to Reverend Randy Phillips. *Id;* Declaration of Randy Phillips.

Following the departure of the man resembling Mitchell, Cannaday and Juanita Sisneros went with Phillips to a farmhouse owned by The Manor which was being repaired for use as another counseling center. Upon arriving at the farmhouse, the group saw two people running away from the house towards a wooded area. Cannaday and Sisneros went into the house and in one of the bedrooms found written in bright red paint on a wall "I killed MacDonald's wife and children."[25] *Id.* at Declaration of Ann Sutton Cannaday; Declaration of Juanita Sisneros. They told Reverend Phillips what they had seen and planned to return later to photograph the wall. When they went back to the farmhouse later in the week, someone had painted over the wall.

Mitchell lived in Charlotte, North Carolina, in the 1970's and became friends with Norma and Bryant Lane. The Lanes recall an incident in 1977 when Mitchell came to their house and seemed depressed and told them after they asked him what was wrong that something was bothering him that was too horrible to talk about. In 1982, Mitchell again told them that something had happened while he was in the service and if anyone found out about it he would have to leave the country. Addendum to Motion for New Trial Declarations of Norma Lane and Bryant Lane. Mitchell died soon thereafter at the age of 31 of cardiopulmonary arrest and alcoholic liver disease. Government's Response to Motion for New Trial, Appendix Vol. I, Ex. F. at Attachment 1.

---

**25.** Cannaday also says that they called a deputy sheriff who went with them on their tour of the house. No affidavit from this law enforcement officer appears in the record and he is not mentioned by either Reverend Phillips or Sisneros.

Little can be said for sure about the evidence offered by MacDonald to show Mitchell's involvement in the murders except that it is at best speculative and circumstantial. Neither Cannaday, Sisneros nor Reverend Phillips personally knew Mitchell and only Cannaday heard the statement by a young man to the effect that he had "murdered people." Granted, Cannaday would have no reason to lie but when viewed against the evidence discussed relative to the Stoeckley confessions, the court cannot accept this one statement to Cannaday over fourteen years ago by a man she did not know as evidence of any substance that Greg Mitchell confessed to the MacDonald murders. Similarly, the fact that two unidentified men were seen running from a farmhouse which had been vandalized is only weakly connected to Mitchell if he was indeed the young man who stayed at The Manor. The affidavits of the Lanes are equally unpersuasive because Mitchell made no specific reference to having been involved in the MacDonald slayings and voluntarily appeared at the Charlotte, North Carolina office of the FBI in late 1981 where he denied any knowledge of the murders. Government's Response to Motion for New Trial, Appendix Vol. I at V. Absent a stronger showing, these affidavits are insufficient to prove Mitchell was in the MacDonald apartment on February 17, 1970.

Finally, MacDonald offers the affidavit of Dr. Ronald K. Wright who on February 15, 1984 after reviewing records and photographs relating to the case, said that he was of the opinion that

> based upon the location of the injuries suffered by Colette MacDonald and the nature of those injuries ... the blow which fractured Colette MacDonald's skull was struck with a club that was in a left-handed swing by a person facing Mrs. MacDonald at the time she was standing [and because] the blow was very forceful I have concluded that it is consistent with some one who was left-handed.

Motion for New Trial, Declaration of Ronald K. Wright, M.D. Dr. Wright's statement is of no evidentiary value, however, because as he later admitted on September 4, 1984,

> [i]ndividuals intoxicated with psychomimetic drugs or enraged by their wife cannot be presumed to strike with their handed side. Therefore, while perhaps slightly more often forceful blows delivered from a deceased's right to left are delivered by lefthanded folk (adjusting for their minority status); it is certainly not unusual to see such a blow delivered by a righthanded individual.

Government's Response to Motion for New Trial, Appendix Vol. III at Ex. E.

■■■ The court has reviewed the other evidence and arguments submitted by MacDonald in support of his contention that Mitchell confessed to these murders and finds them to be without merit. Mitchell, like Stoeckley, may have been tormented by accusations that he was involved in the murders but the court is unable to conclude from the evidence submitted that there is any real likelihood that he was involved.

### D. The Confession of Cathy Perry Williams.

The last confession offered by MacDonald is one by Cathy Perry Williams. Williams, it will be remembered, was the friend of Stoeckley's whom MacDonald claims had possession of the white boots which were turned over to the CID in 1971.

On November 17, 1984, Williams gave a statement to an FBI agent in which she said that she was standing outside of a "head shop" in Fayetteville on the evening of February 16, 1970 when two white females and five or six white males came by in a white stationwagon and talked her into getting into the car with them. She said that after she got in they would not let her get out and they took her with them to a house which the group broke into through the front door. In pertinent part, the remainder of Williams' statement about this incident as told to the FBI agent is as follows:

When they entered the house a white/male was lying on a couch. [WILLIAMS] indicated that one in the group shot him up with some kind of narcotic and he collapsed. She said the rest of them sat around and said that they wanted to come to this place to get high. WILLIAMS said she tried to leave but they would not let her leave, and they forced her to take a pill.

Another male in the group whom WILLIAMS described as blonde headed and fat said that the man who lived there was a doctor and he turned people in who used drugs.

After a while WILLIAMS said that everyone went upstairs. She did not call the police because she did not know the number, so she went upstairs and tried to talk them into coming back downstairs. She said they told her to go away and while she was there she observed that they were pounding on [a] blanket. She said she went into the room and took the baby in her arms to prevent him from being further beaten[ ].

WILLIAMS said that they then forced her to hit the baby. About that time, another child came in and WILLIAMS said she grabbed him and hid him in the closet. She said that the dark headed, dark complected male described above killed the other boy in the bathroom.

WILLIAMS advised that during all of this commotion the mother woke up once but then went back to sleep. WILLIAMS said that she woke her up again and tried to get the woman to jump out the window with her. She said she also asked the woman for a gun because she said that the other people were going to kill them. She described the woman as being skinny and possibly being pregnant. A little while later, the dark skinned dark complected male ordered CATHY to tie the woman up and to kill her. She said that she stabbed the woman several times in the leg and several times in the abdomen. After murdering the woman she wrote in blood on the wall, "Fuck you pigs from all of us to you." She also advised that she wrote the year on the wall also in blood. WILLIAMS advised that they were in the house from approximately 11 p.m. until 4 or 5 a.m. She described the weather as being rather warm and clear there was no rain that evening.

WILLIAMS advised that after the two children and the mother were murdered they left the house and the individuals in the white station wagon took her to her home and warned her not to contact the police.

This statement is yet another example of the bizarre behavior that the case has evoked from people who for some reason find it fascinating and see themselves as having played a part in the gruesome story. Apparent from the most superficial reading of Williams' statement is that the facts retold by her are completely at odds with the known facts and those MacDonald claims were confessed to by Stoeckley. For example, (1) there was no evidence that MacDonald had received an injection of any kind on that night; (2) the front door to the MacDonald apartment was not tampered with; (3) the weather that night was rainy and cold, not warm and clear; (4) the MacDonald apartment did not have an upstairs; (5) Colette MacDonald was not stabbed in the leg or abdomen; and (6) the MacDonalds had two daughters, not sons.

 Williams exhibited unstable behavior in 1970 when she stabbed Jackie Don Wolverton, her pet puppy, and Betty Garcia's son and her problems appear to have gotten no better over the years for she has been diagnosed as a schizophrenic and is presently under her doctor's care. Given the factual inconsistencies in her statement and her mental condition, her attempted confession to these murders is completely unbelievable.

E. Statements of Stoeckley, Mitchell and Williams at a New Trial.

Evidence offered in support of a new trial motion must be of such a nature that it would be admissible at a second trial were one held. *See, e.g., United States v.*

*Mackin,* 561 F.2d 958, 961–62 (D.C.Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977); *United States v. McBride,* 463 F.2d 44, 48–49 (5th Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972). The government takes the position that the hearsay statements of Stoeckley, Williams and Mitchell would be inadmissible at a new trial because the declarants are not reliable and there is insufficient proof that the statements are trustworthy.[26] MacDonald replies that the statements would be admissible under Rule 804(b)(3), F.R.Evid., because there are "corroborating circumstances [which] clearly indicate the trustworthiness of the statement[s]" and because a recent decision by the Fourth Circuit Court of Appeals, *United States v. Brainard,* 690 F.2d 1117 (4th Cir.1982), prevents the court from considering the declarant's credibility when ruling upon statements offered under Rule 804(b)(3).

 Writing for the Court of Appeals in *Brainard,* Judge Murnaghan noted that Rule 804(b)(3) "requires not a determination that the declarant is credible, but a finding that the circumstances clearly indicate that the statement was not fabricated. It is the statement rather than the declarant which must be trustworthy." 690 F.2d at 1124. As shown in a discussion of the statements by Stoeckley and Williams, the circumstances surrounding these statements strongly suggest that they were fabricated by the declarants, either intentionally or unintentionally. Mitchell's statements on the other hand were made under circumstances which would accord them a degree of trustworthiness but there is not enough evidence to show that he actually made them or that they were in reference to the MacDonald murders for them to be of evidentiary value to MacDonald at a second trial.

Even though the *Brainard* decision seemed to foreclose trial courts from considering the declarant's credibility when ruling on the admissibility of statements under Rule 804(b)(3), credibility as a consideration appears to have been revived to a limited extent by the Fourth Circuit's decision in *United States v. Carvalho,* 742 F.2d 146 (4th Cir.1984), an opinion also authored by Judge Murnaghan. After referring to a number of facts which led him to question the motives of an affiant, Judge Murnaghan noted that "[e]ven in light of the *caveat* that it 'is the statement rather than the declarant which must be trustworthy,' *United States v. Brainard,* [690 F.2d] at 1124, we conclude that the ... affidavits lack reliability and, therefore, fail to satisfy the trustworthiness requirement of ... [Rule] 804(b)(3)." 742 F.2d at 150. If after *Carvalho* the declarant's credibility remains a valid consideration for the trial judge to weigh in ruling upon admissibility of statements against interest under Rule 804(b)(3), the admissibility of the statements by Stoeckley, Mitchell and Williams at a second trial would be even more doubtful.[27] Again, according MacDonald the benefit of any and every doubt, however, the court will assume that the statements would be admissible at a new trial and turn to the question of what legal standard is to be applied to this and the other evidence.

#### F. The Legal Standards Applicable to the Motion for New Trial

Arguing that MacDonald's motion is no different than any other motion for a new

---

**26.** There are dozens of affidavits in the record other than the statements of Stoeckley, Mitchell and Perry which also may run afoul of the rule against hearsay but the parties have not contested the admissibility of these statements and the court will assume that the witnesses making them would appear at a second trial if called to testify. Pursuant to the parties' stipulation during the evidentiary hearing, all evidence, including the statements of Stoeckley, Williams and Mitchell, was admitted into evidence without objection for purposes of ruling upon the motion for new trial. Evidentiary Hearing Tr., Vol. 2 at 101.

**27.** Stoeckley also appears to have been offered immunity on several occasions in return for her statements. If made, this promise would mitigate against a finding that the statements were against her interest when made since they did not "tend[ ] to expose [her] ... to criminal liability...." Rule 804(b)(3), F.R.Evid.

trial based upon newly discovered evidence, the government contends that the traditional standard for granting such motions should be applied and that, under this standard, MacDonald "must show that the newly discovered evidence is 'of such a nature that a new trial would probably produce a new result.'" *United States v. Lott,* 751 F.2d 717, 721 (4th Cir., 1985) (*quoting United States v. Mesa,* 660 F.2d 1070, 1077 (5th Cir.1981)). Conversely, MacDonald claims that because the case involves both the suppressed evidence discussed earlier and newly discovered evidence from a neutral source, the court should apply the two more lenient tests of *United States v. Agurs,* that is, the "any reasonable likelihood" or "might have affected the outcome of the trial" tests, to all of the evidence. 427 U.S. at 103–04, 96 S.Ct. at 2397–98. The government responds to this argument by saying even if the *Agurs* tests do apply, the proper test is the third one: whether the evidence "creates a reasonable doubt which did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.

The court having already determined that the government did not suppress evidence, there is no need to decide whether MacDonald is correct that the *Agurs* standards can be used in cases involving both suppression of evidence and newly discovered evidence from a neutral source. The court will note, however, that MacDonald's reading of *Agurs* would be inconsistent with that case because as Justice Stevens noted in the opinion

> [i]f the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*Id.* at 111, 96 S.Ct. at 2401; *see United States v. Imbruglia,* 617 F.2d 1, 4 (1st Cir.1980); *United States v. Sutton,* 542 F.2d 1239, 1242 n. 3 (4th Cir.1976). Reading *Agurs* so broadly as to allow its application to motions for new trial based on newly discovered evidence from a neutral

source would blur the distinction alluded to by Justice Stevens. Although Justice Marshall in dissent points out that the third "create a reasonable doubt which did not otherwise exist" test of *Agurs* is essentially the same as the "probably produce a new result" test, he does not state or imply that suppression standards should be used in cases involving newly discovered evidence from a neutral source. *Agurs,* 427 U.S. at 114–16, 96 S.Ct. at 2402–04 (Marshall, J., joined by Brennan, J., dissenting). Furthermore, accepting MacDonald's broad reading of *Agurs* still would not entitle him to application of the "any reasonable likelihood" standard because there has been no showing that the prosecution knowingly used perjured testimony in the case. *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397.

■ With the possible exception of Stoeckley's statements, the court agrees with the government that the evidence submitted by MacDonald should be weighed against the traditional "would probably produce a new result" standard. Under this test, a new trial will follow if a criminal defendant successfully proves that (1) the evidence was discovered following trial; (2) the defendant exercised due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court and (5) the evidence is of such a nature that a new trial would probably produce a new result. *United States v. Swarek,* 677 F.2d 41, 43 (8th Cir.1982), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 723, 74 L.Ed.2d 949 (1983); *United States v. Mesa,* 660 F.2d 1070, 1077 (5th Cir.1981); *United States v. Pappas,* 602 F.2d 131, 133 (7th Cir.), *cert. denied,* 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979); *United States v. Eldred,* 588 F.2d 746, 753 (9th Cir.1978).

■ Not argued by the parties but persuasive to the court is the argument that at least Stoeckley's statements should be evaluated under the legal standard applicable to new trial motions which are based upon the statements of a recanting witness. At trial, Stoeckley testified that she could not

remember where she had been or what she had done on the night of the murders. Although she has since alternated between lack of memory and almost total recall, on at least ten occasions she has recanted her trial testimony. In this circuit, a motion for a new trial based upon a witness' recantation will be granted only if (1) the court is reasonably well satisfied that the testimony given by the witness was false; (2) without the testimony, the jury *might* have reached a different conclusion; and (3) the defendant was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. *United States v. Wallace*, 528 F.2d 863, 866 (4th Cir.1976); *see United States v. Carmichael*, 726 F.2d 158, 159 (4th Cir.1984); *United States v. Johnson*, 487 F.2d 1278, 1279–80 (4th Cir.1973).

### G. The Merits of MacDonald's Motion for New Trial

The jury's guilty verdict following the almost seven weeks of trial in 1979 was fully supported by the evidence and MacDonald's challenge to the sufficiency of the evidence was rejected by this court and the Fourth Circuit Court of Appeals. *United States v. MacDonald*, 485 F.Supp. at 1097; *aff'd*, 688 F.2d at 234, *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). The government presented a thorough case against MacDonald, using substantial physical and circumstantial evidence and expert testimony in its case-in-chief. MacDonald answered the prosecution's allegations with his own story that the murders had been committed by four intruders who entered his home through an unlocked back door in the early morning hours of February 17, 1970, but the jury obviously declined to accept this story and chose instead to believe the government's version of what transpired that night.

Were a second trial held, the government would again be able to introduce such damaging evidence against MacDonald as his pajama top, the location of fibers from the pajama top in parts of the house which would be inconsistent with MacDonald's story, the bloody footprint leaving Kimberly MacDonald's bedroom, the pajama top demonstration whereby it was shown that the holes in the top matched icepick wounds on the body of Colette MacDonald, and the other evidence which proved, apparently conclusively so, that MacDonald murdered his family. The government's case has not been materially enhanced since the first trial, founded as it is upon evidence derived from a static crime scene, but the court is unable to conclude that the evidence would not again be persuasive to a new jury.

Reduced to its essence, MacDonald's evidence at a second trial would consist of his own account of the murders, character witnesses on his behalf, impeachment of the integrity of the crime scene, and the statements, if successfully admitted into evidence, of Stoeckley, Mitchell and Williams and evidence supporting these statements. The question thus becomes whether this evidence when weighed against the government's evidence is sufficient to warrant granting of the motion for a new trial.

The statements by Helena Stoeckley, as a recanting witness, are not enough to justify a new trial of the case because they fail to satisfy two of the three prerequisites under *United States v. Wallace*, 528 F.2d at 866, and the failure to meet any of these requirements is fatal to the motion. *United States v. Carmichael*, 726 F.2d at 159. Far from being "reasonably well satisfied that the testimony given by [Helena Stoeckley at trial was] false," *Wallace*, 528 F.2d at 866, the court is certain that Stoeckley was telling the truth at trial when she testified that she could not recall her whereabouts on the night of the murders. This was what she said for over ten years following the crimes and MacDonald has failed to convince the court that her "confessions" show otherwise. These statements are factually erroneous and inconsistent not only with MacDonald's story but with the physical evidence gathered from the crime scene and whether they were created from the memory of a confused young woman's mind or intentionally fabricated, perhaps with Beasley's assist-

ance, a review of the record leaves the court without any doubt that the statements are false and that Stoeckley's trial testimony was accurate.

Even were the court to assume Stoeckley lied on the witness stand, it could not conclude "[t]hat without [Stoeckley's testimony] the jury *might* have reached a different conclusion." *Wallace,* 528 F.2d at 866. It may well be that Stoeckley's trial testimony took the defense by surprise, but if the jury had not heard that testimony but instead had heard her so-called confessions, in the court's opinion the jury would not have reached a different verdict, for the government's cross-examination would surely have developed the glaring inconsistencies in her story as previously noted and that because of her drug-crazed condition she was a totally unreliable, untrustworthy witness.[28]

Mindful of the Fourth Circuit's observation that "[w]here a motion for a new trial is based upon recantation of testimony given at ... trial, such recantation is 'looked upon with the utmost suspicion,'" the court finds that the facts do not support MacDonald's arguments and concludes that with or without Stoeckley's trial testimony or her "confessions," the jury would still have rendered a guilty verdict. *Johnson,* 487 F.2d at 1279 (*quoting United States v. Lewis,* 338 F.2d 137, 139 (6th Cir.1964)); *United States v. Troche,* 213 F.2d 401, 403 (2d Cir.1954).

A similar conclusion follows when all of the newly discovered evidence, including Stoeckley's post-trial statements, is measured against the traditional new trial standard requiring "that the newly discovered evidence [be] 'of such a nature that a new trial would probably produce a new result.'"[29] *United States v. Lott,* at 721.

This is of course a more stringent test than the one used for recanting witnesses and MacDonald's evidence falls even further below this standard. The court will assume as true defense counsel's claim that all of the new evidence was discovered after trial and counsel used due diligence to discover the evidence, but when the new evidence is balanced against the evidence presented by the prosecution following its more than eight-year investigation of the MacDonald case which established a motive for the murders and a theory concerning their commission, and against the absence of any direct, physical evidence proving MacDonald's story, the newly discovered evidence with its multiple inaccuracies and inconsistencies would not produce a different result were it introduced at a second trial, nor is there any reasonable likelihood that a jury would acquit MacDonald based upon the newly discovered evidence. The motion for new trial must therefore be denied.

### *Conclusion*

Almost nine years passed between the MacDonald murders and the time the case came on for trial before this court and a jury in July of 1979. The parties on both sides of the case fully availed themselves of the opportunity before trial to investigate the crime scene and to develop the evidence which was introduced at a trial lasting almost seven full weeks and resulting in MacDonald's being found guilty of the murder of his wife and two young daughters.

Over five years have now passed since the trial, more investigation has been undertaken and more evidence entered into the record, but the result is the same. The court has been unable to find that the prosecution used a psychiatrist as an inves-

---

**28.** Just how much of the newly discovered evidence defendant might offer at a new trial would pose serious tactical problems for trial counsel. It seems obvious to the court that the use of at least some of it (*e.g.,* the Cathy Williams statement) would cast serious doubt on the credibility of the remainder.

**29.** Although the court has found that the government did not use Dr. Brussel as an investigative agent in examining MacDonald and there has been no suppression of evidence, the documents supporting these motions which MacDonald says he did not have access to until after trial have also been considered by the court as newly discovered evidence for purposes of ruling on the motion for new trial.

tigative agent to obtain incriminating statements from MacDonald during trial, nor has it been able to conclude that the government suppressed any evidence favorable to MacDonald, either before, during or after trial.

The case has attracted an astonishing amount of publicity. Helena Stoeckley, Cathy Perry Williams and, to a more limited extent, Greg Mitchell, were drawn to the case and have contributed to a factual charade which has allowed it to continue for more than a decade and a half. Their "confessions" have been shown to be unbelievable and, even with the affidavits offered to corroborate the statements, if the government were again called upon to present its evidence at a new trial and MacDonald was able to put all, or even selected parts of his new evidence before a second jury, the jury would again reach the almost inescapable conclusion that he was responsible for these horrible crimes.

The three motions presently before the court must therefore be denied. An order accordingly will be entered.